Glenda Gail ROBINETTE, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 48S00–9910–CR–614.

Supreme Court of Indiana.

Jan. 11, 2001.

Louis W. Denney, Muncie, Indiana, Attorney for Appellant.

Karen Freeman–Wilson, Attorney General of Indiana, Grant H. Carlton, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

BOEHM, Justice.

At a jury trial, Glenda Robinette was found guilty of murder, criminal confinement, and burglary resulting in bodily injury. The trial court entered a verdict of guilty but mentally ill and sentenced Robinette to fifty-five, ten, and thirty years, respectively, to be served concurrently. Because the trial court erroneously admitted videotaped statements Robinette made after being Mirandized and asserting her right to remain silent, we reverse and remand for a new trial.

**Factual and Procedural Background**

Robinette and Michael Gougeon had dated for five years when Gougeon ended their relationship and started dating Carrie Sherman. In the wee hours of September 6, 1998, Gougeon and Sherman were asleep at Sherman's house when Sherman awoke to see Robinette standing beside her bed holding a gun. Sherman told Robinette to hand her the gun and woke up Gougeon, who walked across the room, turned on the light, and also directed Robinette to surrender the gun. Robinette then shot Gougeon five times. After locating Gougeon's car keys, Robinette escorted Sherman at gunpoint to Gougeon's parked car and ordered Sherman into the car. Sherman complied. Robinette then drove about six blocks to a church parking lot where she ordered Sherman into the trunk. After driving some distance more, Robinette abandoned the automobile. Sherman was discovered nine to eleven hours later by passers-by who heard her knocking and screaming from inside the trunk.

Three days later, Robinette turned herself in to police in Pendleton. She was then transferred to Anderson, where she was twice interviewed by the police after being Mirandized. She refused to sign Miranda waivers and asserted her right to remain silent nearly fifty times during the course of these interviews, stating, "I don't want to talk about it." Despite her unmistakable assertion of this right, she was interrogated first for three hours and fifteen minutes and a second time for forty-five minutes. The videotapes of Robinette's interrogations were admitted into evidence over the objections of defense counsel and are the basis of this appeal.

### I. Admission of Videotapes

At trial, the State moved for admission of a videotape of Robinette's first interview with Anderson police officers. Defense counsel objected on the ground that it had not been clarified whether Robinette had formally waived her Miranda rights. The trial court admitted the videotape. The State later moved for admission of a videotape of Robinette's second interview with police. Defense counsel again objected, arguing that, in view of Robinette's use of profanity during questioning, the prejudice of having the videotape admitted outweighed its relevance under Indiana Rule of Evidence 403. Defense counsel also pointed out that Robinette had a constitutional right to remain silent that had been exercised and ignored by police. After noting that Robinette had raised the affirmative defense of mental disease or defect,

the State argued that it was significant that Robinette had understood her rights and responded appropriately to questions. The State further asserted that the videotape was probative of her "awareness of her surroundings, awareness of what was going on" close to the time frame of the murders and that the statement, "I'm not talking to you about it," rebutted her contention that she had no memory of the incident. The trial court agreed with the State, proclaiming that "we have a responsibility to let [the State] put [the videotape] on ... to rebut some of the things that psychiatrists say in their reports.... I haven't read the cases, but the notes suggest that the insanity issue trumps everything else."

After the videotapes had been admitted, the trial court, realizing its error, gave a limiting instruction with regard to the first videotape to the effect that the jury should consider it for the "limited purpose of judging Miss Robinette's physical appearance, carriage and demeanor at the time that first tape was made." The trial court further instructed the jury to disregard completely the second videotape. Robinette argues that the trial court's attempt to rectify its error was insufficient.

In *Doyle v. Ohio,* the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment is violated when the defendant's post-arrest and post-Miranda silence is used to impeach the defendant's exculpatory explanation at trial. 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The Court explained, "[W]hile it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." *Id.* at 618, 96 S.Ct. 2240. In *Wainwright v. Greenfield,* the Supreme Court extended the rule in *Doyle* to apply to the use of a defendant's post-arrest silence as evidence of sanity. 474 U.S. 284, 295, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). The Court concluded that there was no viable distinction be-tween the use of the defendant's post-arrest silence for impeachment purposes and its use as evidence of the defendant's sanity. Rather, "[i]n both situations, the State gives warnings to protect constitutional rights and implicitly promises that any exercise of those rights will not be penalized." *Id.* at 292, 106 S.Ct. 634.

This Court had occasion to address *Doyle* and *Wainwright* in *Lynch v. State,* 632 N.E.2d 341 (Ind.1994), and *Wilson v. State,* 514 N.E.2d 282 (Ind.1987). In *Lynch,* at the outset of his interrogation by police, the defendant had asserted his right not to be questioned without an attorney present. A tape of the interrogation was admitted for the purpose of establishing the defendant's state of mind shortly after he shot his father. The defendant's sanity was an issue in the trial. 632 N.E.2d at 341–42. In *Wilson,* as evidence of the defendant's sanity, the State elicited testimony as to the defendant's exercise of his right to remain silent and his right to consult with an attorney. 514 N.E.2d at 283. Relying on *Doyle* and *Wainwright,* this Court reversed both of these convictions and remanded for new trials. The same result is required here.

The State does not seriously defend the admissibility of the videotapes. Rather, the State argues that any error was harmless because the jury was subsequently instructed that it was to use the first videotape only for purposes of observing Robinette's demeanor and carriage and that they should disregard the second videotape altogether.

■ The use of a defendant's post-Miranda silence to impeach a defendant's exculpatory explanation or to prove a defendant's sanity is subject to harmless error analysis. *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ("The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.") (citation omitted); *Thomas v. State,* 910 F.2d 1413, 1414–15 (7th Cir.1990) ("All the psychiatric evidence in-

dicated insanity, though how strongly was a question for the jury. So we cannot dismiss as harmless the error in admitting the evidence of his silence."). Under the harmless error analysis, the State bears the burden of establishing that the federal constitutional error was harmless beyond a reasonable doubt. *Brecht v. Abrahamson*, 507 U.S. 619, 629–30, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (citing *Chapman*, 386 U.S. at 24, 87 S.Ct. 824); *Rawley v. State*, 724 N.E.2d 1087, 1090 (Ind.2000). In analyzing whether a *Doyle* violation is harmless beyond a reasonable doubt, this Court examines five factors: (1) the use to which the prosecution puts the post-arrest silence; (2) who elected to pursue the line of questioning; (3) the quantum of other evidence indicative of guilt; (4) the intensity and frequency of the reference; and (5) the availability to the trial judge of an opportunity to grant a motion for mistrial or give curative instructions. *Bieghler v. State*, 481 N.E.2d 78, 91–92 (Ind.1985)

(quoting *United States v. Massey*, 687 F.2d 1348, 1353 (10th Cir.1982)).

■ We cannot conclude that the State has proved beyond a reasonable doubt that the admission of Robinette's post-Miranda silence as evidence of her sanity was harmless. Robinette offered substantial testimony to the effect that she suffered from a condition rendering her unable to recall or appreciate the crimes she committed.[1] Her two videotaped statements, in which she repeats, "I don't want to talk about it," dozens of times could have easily left jurors with the impression that Robinette had enough of her wits about her to recognize that it was not to her benefit to speak with police. On these tapes she provided the police with general information such as her name, age, and address, yet declined to speak about the crimes with which she was charged. Jurors listened to her repeated refusals to answer for four hours, during which time she was badgered and chastised by police for being uncooperative and occasionally responded belligerently.[2]

1. Robinette was initially deemed incompetent to stand trial on December 7, 1998. She was committed to the Department of Mental Health in Madison County. In March 1999, she was determined to be competent and in April was returned to the Madison County Detention Center pending further order of the trial court. Robinette raised the defense of insanity and presented the testimony of several psychiatrists and psychologists. Dr. Gary L. Crawley, who had evaluated Robinette and determined she was incompetent to stand trial, testified that, when he examined her in October of 1998, Robinette was unable to provide him with "information of meaningful [ ] events that had happened recently" and that "[s]he may well have been mentally ill, severely and psychiatrically impaired at the time the crimes are alleged." Dr. Julie Nethercutt, a clinical psychologist, also examined Robinette in October 1998 and concluded "that she was not able at that time to assist in her defense or ... fully understand what she was facing." A psychiatrist for the Center for Mental Health in Anderson, Dr. Gregory B. Richardson, testified that he did not believe Robinette was able to "understand the wrongfulness of her conduct" and was "psychotic and virtually completely unconscious of the event." Richardson examined Robinette in September of 1998 when she was brought to the psychiatric ward of St. John's Hospital in

Anderson after deteriorating into a catatonic state in jail. At that point Robinette was uncommunicative, unresponsive to pain, and was not eating. Dr. Robert Holt, another psychiatrist at the Center for Mental Health, testified that he had provisionally diagnosed Robinette with a "dissociative disorder." Finally, Robinette offered the testimony of Dr. Susan Spencer, a private practice psychologist, who concluded that Robinette was suffering from a mental disease or defect at the time of the offense and was not aware of her actions.

> She was not capable of understanding ..., not aware of what she was doing, but she was unable to understand the consequences or the importance of that behavior, what that might mean to someone else or to her. I guess a way to put it simply is this woman was not there when that happened.

The State did not present any expert evidence of its own regarding Robinette's sanity.

2. Although Robinette repeatedly stated she "did not want to talk about it," Anderson police officers continued their attempts to get her to speak:

> I need to ask you some questions, okay? And I need some answers. ... Will you do that for me? Huh? Will you do that for me, Gail? Please? Gail! Gail! Gail, wake

Given that Robinette produced experts willing to testify to her lack of mental capacity at the time of the crimes and that the only other evidence of Robinette's sanity around the time of the crime was the testimony of Sherman, the admission of the videotapes could have easily contributed to her conviction. *Cf. Thomas*, 910 F.2d at 1414–15 (reversing where psychiatric testimony indicated insanity and only evidence of sanity was defendant's silence after being Mirandized, his request for counsel, and his "outwardly calm appearance"). Instructions to consider the first videotape only for the purpose of observing Robinette's demeanor and to disregard the second videotape fell well short of curing the harm.

■ The State argued that observations of her demeanor were relevant to rebut the defense's psychiatric testimony that Robinette's catatonia was a natural continuation of a state that began at the time of the crime. Relevancy is beside the point. Even confessions are suppressed if obtained in violation of Miranda rules. Obviously they are highly relevant, but the Constitution prohibits use of post-Miranda statements, relevant or not. The only real issue presented by the State is the possibility of harmless error. But the principal issue in the case was Robinette's sanity at the time of the shooting. As discussed above, because the tape contained Robinette's repeated seemingly sane attempts to assert her rights, we cannot conclude that it had no effect on the resolution of that issue.

■ The State alternatively argues that evidence of Robinette's sanity is proper because Robinette has opened the door by raising the insanity defense. Although it is correct that "[a] plea of insanity opens the door for the admission of testimony about the defendant's entire life," *Shepherd v. State*, 547 N.E.2d 839, 841 (Ind. 1989), raising the insanity defense does not allow the admission into evidence of testimony obtained in violation of a defendant's Miranda rights. Indeed, *Wainwright*

... Look at me. ... Will you answer some questions if we ask them? Huh? Will you? Gail, will you answer some questions if we ask them? Please? Gail. Gail. I'm going to keep asking you, please, will you answer some questions and ... if we ask them. Huh? Answer me instead of ignoring me.
....
This is pretty frustrating. I've sat here for two hours and a half trying to talk to me with you. You haven't opened up at all. ... Sit back like I am and talk with me, will you? Will you do that? We've offered to get you something to drink, something to eat, you've turned us down. ... We've done everything to be nice to you. Nobody's forced you or coerced you or threatened you or anything like that.
....
You try to hide, and you ... I keep telling you that (inaudible) not going to go away. We're going to be here. You're going to hear us over and over again, and in a few minutes, Detective Benson and I are going to get tired. And you know what, we're putting together a second team to come in here, and they'll talk to you about Michael. ... You can twist. You can turn. You can say, "I don't want to talk about it." "It doesn't matter." ... We need you to just go ahead and get this over with.

....
This, this is something that's not going to go away. It's going to be here, and we're going to talk about it, and you might as well just get, cleanse your system a little bit.
....
You're not even trying to deny that you, those allegations that you murdered him. So what's that, what's that tell us right there? There must be some truth to it because if you're innocent you'd be sitting there telling us that. ...
....
We're not going to go away. We're not going to take you back to the jail right now because we have some things we need to discuss here, okay? Something bad has happened, and we're investigating something that's happened. It's really bad, okay? It involves a human life, okay? You know about it, so you need to tell us what you know about it. I'm tired of dancing around, dancing around the subject here. We're in for a very serious thing, and I'm not going to sit here and cater to you because you act like you're mad, you don't want to talk about it. Well, we're here to talk about it. Okay? Now I want you to talk to me about this.

would be meaningless if the State were correct. The State's argument that the error is harmless because Robinette said nothing incriminating about the charges against her is specious. Robinette did not deny she committed the acts. Rather, Robinette argued that she had done these things, but was insane at the time. Her invocation of her right to remain silent bore directly on that issue.

■ The admission of these videotapes was reversible error.[3] Robinette is therefore entitled to a new trial.[4]

## II. Sufficiency of the Evidence

Robinette argues that the evidence was insufficient to support a conviction of guilty but mentally ill. If so, double jeopardy would preclude a retrial. *Thompson v. State*, 690 N.E.2d 224, 237 (Ind.1997). Because Robinette does not dispute that she committed these crimes, Robinette's contention in effect amounts to the claim that she should have been found not responsible by reason of insanity. Ind.Code § 35–36–2–3 (1998). In order to succeed on an insanity defense, a defendant must prove by a preponderance of the evidence, *id.* § 35–41–4–1(b), that she was, "as a result of mental disease or defect, ... unable to appreciate the wrongfulness of the conduct at the time of the offense." *Id.* § 35–41–3–6.

■ A defendant appealing the rejection of an insanity defense must demon-strate that the evidence was without conflict and led only to the conclusion that the defendant was insane when the crime was committed. *Weeks v. State*, 697 N.E.2d 28, 29 (Ind.1998). A determination of insanity is a question for the trier of fact and the jury is free to disregard the testimony of experts and rely upon that of lay witnesses. *Gambill v. State*, 675 N.E.2d 668, 672 (Ind.1996) (quoting *Barany v. State*, 658 N.E.2d 60, 63–64 (Ind.1995)).

■ Here, the jury found Robinette guilty of murder, criminal confinement, and burglary as a Class A felony, but the trial court entered a verdict of guilty but mentally ill.[5] The evidence did not lead only to the conclusion that Robinette was insane when the crimes were committed. Although several medical professionals testified on Robinette's behalf and agreed that Robinette suffered from mental illness, not all of them were willing to state with absolute certainty that Robinette was unaware of her actions at the time of the crime. More importantly, Sherman testified at trial that she had not observed anything indicating that Robinette did not know what she was doing. She testified that Robinette remained "calm" throughout the entire episode. The erroneously admitted tapes supported this. Sherman also testified that Robinette directed Sherman out the back door instead of the front, asked for a drink, and reloaded the gun before driving away. According to Sherman, after Sherman spoke to Robinette

3. At trial, defense counsel conceded that he had not objected to the admission of the first videotape even though a review of the record seems to indicate a clear objection on the specific ground that there was no determination as to whether Robinette had waived her rights after being Mirandized. Thus, we have employed a harmless error analysis. In the absence of an objection at trial, this Court employs a fundamental error analysis. *See, e.g., Wilson*, 514 N.E.2d at 284. Analyzing the admission of the first videotape employing fundamental error would be unlikely to change the result here.

4. Because Robinette is entitled to a new trial, we do not address the propriety of her argu-ment that the trial court should have ordered a mistrial even though it was not requested by either party. For the same reason, we do not address her contention that the trial court erred in proceeding to trial without a formal order of competency.

5. We would note that Robinette's convictions for murder and burglary as a Class A felony appear to raise a claim under the Indiana Double Jeopardy Clause. *See Richardson v. State*, 717 N.E.2d 32 (Ind.1999). Robinette has not raised this issue so we decline to address it. *See Roop v. State*, 730 N.E.2d 1267, 1270 n. 2 (Ind.2000).

about Sherman's son, Robinette told her that was why she had not shot her yet. The jury was free to conclude that the evidence before it did not indicate that Robinette was unable to appreciate the wrongfulness of her conduct at the time of the offense. Because there is sufficient evidence to support Robinette's convictions, there is no double jeopardy bar to retrial.

### Conclusion

The judgment of the trial court is reversed and this cause is remanded for proceedings consistent with this opinion.

SHEPARD, C.J., and DICKSON, SULLIVAN, and RUCKER, JJ., concur.