**Gregory L. GALLOWAY, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 33A01–0906–CR–280.

Court of Appeals of Indiana.

Jan. 26, 2010.

Transfer Granted April 1, 2010.

Stacy R. Uliana, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Angela N. Sanchez, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Chief Judge.

Appellant-defendant Gregory L. Galloway appeals his conviction for Murder,[1] a felony. Galloway argues that he should have been acquitted based on his defense of insanity and that the trial court erred by finding him guilty but mentally ill. Finding that we are compelled by our Supreme Court's opinion in *Thompson v. State*, 804 N.E.2d 1146 (Ind.2004), to affirm, we do so.

## FACTS

### Galloway's History of Mental Illness

As the trial court found, Galloway

was first evaluated at the age of 17 and given a diagnosis of adjustment disorder with disturbance of conduct. Counseling was recommended. His mental health treatment continued, unabated, during his entire adult life. His psychotic episodes increased in duration and frequency despite effort at stabilization through antipsychotic medication. [Galloway] lacks insight into the need for his prescribed medication.

Appellant's App. p. 255. Since Galloway was in high school, his parents had attempted to have him institutionalized many times but were unable to find an institution in Indiana that provided long-term secure care. By 2007, twenty different physicians had diagnosed Galloway with bipolar disorder, often with severe psychotic and manic symptoms. As Galloway grew older, his psychotic symptoms increased. Galloway has been committed on a short-term basis over twenty times, but was always released back to his parents after two weeks of care.

A year after high school, Galloway got married and eventually had three children. His mental health continued to deteriorate, making it difficult to hold a job

1. Ind.Code § 35–42–1–1.

or stay married. He also struggled with substance abuse. In 2000, Galloway and his wife divorced, and he moved in with his grandmother, who lived next door to his parents. Galloway and his grandmother had an excellent relationship and he loved her very much. Over the next five years, Galloway had about twenty jobs, and eventually began receiving Social Security benefits because of his mental illness. Beginning in 2001, Galloway experienced a series of psychotic episodes that began to increase in frequency and severity. For example:

- On April 11, 2001, Galloway received 29 stitches on his forearm. When he returned home, he flew into a rage, broke glass, took pictures of the wall, and yelled at his grandmother.
- A few weeks later, Galloway believed the television was talking to him and that he could read minds and others could read his. He was voluntarily admitted to the psychiatric unit at Ball Memorial Hospital.
- In February 2002, Galloway's parents found him with a gun, looking for ammunition. He planned to kill his grandmother because she was the devil, and he planned to kill his neighbor, whom Galloway believed was controlling his son. His parents took him to the emergency room, where he hit his father and had to be restrained by police. He was paranoid and believed that there was cocaine in the air. His parents involuntarily committed him but he was released in early March.
- On March 29, 2002, Galloway followed a woman he believed to be a relative. She became frightened and went to a State Police Post. Galloway followed her inside, and the police subsequently took him to Wishard Hospital, where he was admitted and remained until April 10. Galloway was transferred to the more restrictive Richmond State Hospital, where he remained until August 7, 2002.

- On April 4, 2003, Galloway's parents sought treatment for him because he had not slept in a week and was becoming disruptive. When he arrived at the hospital, he was psychotic and believed he was there to get a gap in his teeth fixed. He was committed for ten days.
- On June 30, 2004, Galloway's mother received a call from a nurse at a hospital in Ohio, explaining that Galloway was in the hospital and disoriented. Earlier that day, Galloway believed that God had told him to leave his job. He then drove to Dayton and ended up in a stranger's driveway, looking for the perfect wife for the son of God. After being committed to the hospital, Galloway believed that he had a magic key and his doctor was the devil.
- A few weeks after his release, Galloway stopped his truck in the middle of I–69 and got out. He believed that Saddam Hussein proceeded to escort him to the Lebanon Police Department. He was admitted to a hospital and released one week later.
- On July 21, 2005, Galloway believed his mother was the devil and he wanted to kill her. He ended up in a car chase with his mother, crashing when he drove through a curve too quickly. When he was admitted to the hospital, he stated he was an alien and protected from harm.
- On May 10, 2006, Galloway broke into his mother's room, threatened to kill her, and had to be restrained by his father. He was committed to Richmond State Hospital. When he was admitted, he believed that he had been shot in the forehead and bitten by a poisonous snake. He tested positive

for cocaine and was evaluated to be homicidal. He was released a few days later.

- On January 18, 2007, Galloway stopped his car on the interstate near Lafayette, got out of his car, and began yelling and talking to himself, threatening bystanders. Police officers escorted him to the emergency room, where he was mumbling to himself, aggressive towards the staff, and reacting to visual and auditory hallucinations. He was admitted into the hospital for a few days.

- On March 11, 2007, Galloway had refused to sleep or eat for a week because he was afraid something bad would happen to him. He crashed through his grandmother's back window when he was locked out and had to be taken to the hospital because he had sustained cuts to his stomach. He was admitted to the hospital for four days. He was then transferred to an Anderson hospital, where he was in a borderline catatonic state and detached from reality. He was released after four days.

- Three days later, on March 23, 2007, Galloway did not know who or where he was. He had been staying awake all night and sleeping in his parents' bed because he believed someone was in his room. He was hearing voices. He was involuntarily committed and diagnosed with schizo-affective disorder, bipolar type, and found to be a danger to himself. He stayed in the hospital for less than one week.

- In June 2007, Galloway's parents received a call from Tennessee authorities. The police had found Galloway in his semi, hauling gasoline and threatening to drive it into a gas station and blow it up. He was talking to himself, had benzodiazepine and cocaine in his system, and had not slept for three days. He was homicidal and suicidal. He stayed in a Tennessee institution for four days.

### The Murder

During the week leading up to October 26, 2007, Galloway exhibited more strange behavior. He heard voices and thought his grandmother's trailer was haunted. He slept on the floor next to his parents' bed, holding his mother's hand, because he was afraid of a ghost at his grandmother's home. On the night of October 25, 2007, Galloway did not sleep. He drank a pint of whiskey, stopping around 3:00 or 4:00 in the morning.

The morning of October 26, 2007, Galloway was feeling a little strange. His friend called because Galloway was supposed to pick him up from work, but Galloway belligerently refused to do so, and uncharacteristically yelled at his friend. At some point, Galloway and his father had a conversation. Galloway's father was concerned because Galloway was not acting normal and seemed to be in another world.

Around 1:00 p.m., Galloway went to a store with his aunt and his grandmother, and they shopped without incident. Then, they went to lunch without any arguments. On the way home, they stopped at the gas station and his grandmother said she had had a wonderful day.

When they arrived home, Galloway's aunt and grandmother sat on the couch and talked while Galloway went outside. Galloway's fifteen-year-old son, Cory, arrived and said "hi" to his dad, who was sitting on the porch swing. Cory could tell that his father was not in a normal state of mind. Galloway went into the house, followed by his father. Galloway walked into his bedroom, got his knife, and walked back down the hallway. He had a "wild

look" in his eyes. Tr. p. 60. He straddled his grandmother and stabbed her in the chest, yelling, "you are going to die, I told you, you're the devil." *Id.* at 50, 74–75. Galloway's father yelled, "What have you done," to which Galloway responded that she "was going to kill me." *Id.* at 85.

Galloway's father ordered Galloway to give him the knife, and he complied. While the family waited for the ambulance to arrive, Galloway told his grandmother that he loved her, it would be okay, and he did not mean to do it. Galloway's aunt told him to stay on the swing outside and not leave. He complied. When the ambulance arrived, he pleaded with the paramedics to save his grandmother because he loved her. He told the sheriff's deputies that he loved his grandmother and would not hurt her. While in the police car, Galloway did not understand what was happening and asked where he was going. Galloway's grandmother eventually died from the stab wounds.

Later that evening, the police interviewed Galloway and he cooperated. He said that he loved his grandmother with all his heart and that she had helped him more than anything. He stated that he had not done any illegal drugs for two weeks and had not taken his prescription medications for two days, although he was supposed to take them twice a day.

Galloway told the police that his father had "persuaded [him] to kill [his] grandmother" when he was sitting on the swing before going shopping with his aunt and grandmother. State Ex. 6A at p. 14–15. While at lunch with his grandmother and aunt, Galloway started believing that his grandmother was against him and had done something bad to him. He came to believe that "life should be more colorful" and that things would be "prettier" and "better," and that if he killed his grandmother, life would be better again. *Id.* at 20. While they were having lunch, he was hoping she would die. After they arrived home, Galloway believed he read his father's mind and that his father was telling him he would have to kill his grandmother "to feel good again to see like the bright lights and the flowers and the pretty things." *Id.* As soon as Galloway stabbed his grandmother and everyone started screaming, he realized that he did not feel better like he thought he would and he hoped his grandmother would live. He later told three experts that he had believed his grandmother was the devil who was out to get him and that he needed to kill her to restore his powers. Tr. p. 224, 298–99.

### Legal Proceedings

On October 29, 2007, the State charged Galloway with murder. On November 26, 2007, Galloway filed a notice of defense of mental disease or defect and a motion for determination of competency. He was found to be competent to stand trial. On April 22, 2008, Galloway waived his right to a jury trial and stipulated that his grandmother had "died as a result of physical injury received from the act of Gregory Galloway stabbing her in the chest with a knife on October 26, 2007, at her residence in Henry County, Indiana." Appellant's App. p. 60, 62.

Galloway was examined by his own psychiatrist, Dr. Parker, a court-appointed psychiatrist, Dr. Coons, and a court-appointed psychologist, Dr. Davidson. All three agreed that Galloway suffers from severe mental illness, that he suffered from a paranoid delusion that is a symptom of severe psychosis, and that he has suffered from psychosis on and off since 1999. None of the three believed that Galloway was malingering or dishonest. Dr. Coons diagnosed Galloway with schizoaffective disorder, Dr. Parker diagnosed him with schizoaffective disorder, bipolar

type, and Dr. Davidson diagnosed him with bipolar manic with psychotic features.

Dr. Coons testified that Galloway was insane at the time of the stabbing. He based his opinion on the long history of mental illness and the facts that Galloway had been having delusions for days before the stabbing and had no rational motive. Dr. Coons explained that people can be jolted out of a delusion quickly, and that Galloway was jolted back to reality when he did not feel better after stabbing his grandmother.

Dr. Parker also testified that Galloway was insane at the time of the offense. He relied on the long history of hospitalizations, his failure to take his medication, the fact that the stabbing occurred in front of his family without any effort to conceal evidence, his lack of insight at the scene into what he had done, his lack of motive, and his statements during the stabbing. Dr. Parker agreed with Dr. Coons that Galloway was jolted out of his delusion by his realization that he did not feel better and had killed someone he loved deeply.

Dr. Davidson offered a preliminary opinion that Galloway was sane at the time of the offense. At trial, however, when he learned of additional facts regarding Galloway's behavior before and during the offense, he retracted his opinion. He testified that he was uncertain as to Galloway's sanity at the time of the offense, and the fact that Galloway's aunt heard him say that his grandmother was the devil as he stabbed her "certainly makes it more difficult to know whether he was capable of appreciating the wrongfulness [of his actions]." Tr. p. 250, 253.

A bench trial was held on October 6 and 7, 2008, after which the trial court took the case under advisement. On December 22, 2008, Galloway filed a second motion for determination of competency because of the deterioration of his mental state. He was found incompetent and not restored to competence until March 2009. On May 4, 2009, the trial court found Galloway guilty but mentally ill, finding and concluding as follows:

11. [Galloway] repeatedly discontinued medication because of side effect complaints and would self medicate through the abuse of alcohol and illicit drug use including marijuana and cocaine.

There is no evidence that this pattern of conduct will not continue if [Galloway] is hospitalized and released, posing a danger to himself and others in the community. [Galloway] is in need of long term stabilizing treatment in a secure facility.

* * *

13. ... [Galloway] and [the] victim communicated and interacted with each other and other people on the day of the offense by sharing a meal, shopping and obtaining gas at a filling station.

14. This lay witness testimony that [Galloway], at the time of the shootings, was able to conform his conduct to requirements of the law supports a determination that [Galloway] was not insane at the time of the offense despite testimony of the defense and court-appointed psychiatrists....

* * *

17. [Galloway] has a long history of periods of stabilization through anti-psychotic medication and family supervision. [Galloway] also has a long history of voluntarily discontinuing his medication despite the well-meaning efforts of this family, then decompensating into a

subsequent psychotic episode. [Galloway] also has a long history of voluntarily abusing alcohol, using illegal substances and misusing prescribed medications. There is no way to determine with certainty if the present criminal offense was the result of voluntary illegal drug usage, prescription abuse or not.

\* \* \*

19. The Court finds no evidence of malingering or evidence of fabricating the long history of mental illness. [Galloway] interacted with people appropriately on the day of the offense and made no effort to conceal the crime, committing the offense in front of family members during broad daylight. [Galloway] made no effort to leave the crime scene or evade police, promptly surrendered the weapon and cooperated with law enforcement at all times. The Court finds this probative of sanity.

20. ... The Court has considered the demeanor of [Galloway] during the proceedings. [Galloway] was alert and oriented throughout the proceedings and assisted his counsel and the investigator. [Galloway's] demeanor on the date of the offense is relevant and probative of sanity wherein [Galloway] was able to run routine errands, shop, converse and participate in a meal in a public restaurant, all without incident.

\* \* \*

22. Each of the examining doctors found that [Galloway] was mentally ill and were divided on the issue of insanity. The Court finds that [Galloway] has an Axis I mental illness and meets the legal definition of "mentally ill."

23. After considering all of the mental health records, the testimony of the examining doctors, the behavior of [Galloway] on the day of the offense and the demeanor of [Galloway], the Court finds that [Galloway] is mentally ill, but has failed to establish the defense of insanity by a preponderance of the evidence. The Court finds and adjudicates [Galloway] guilty of the offense charged, murder, but mentally ill.

Appellant's App. p. 255–58 (original emphasis omitted). On June 2, 2009, the trial court sentenced Galloway to fifty years imprisonment. At the sentencing hearing, the trial court explained its decision as follows:

... There is absolutely no evidence that this mental illness is [feigned], or malingered, or not accurate and there is no dispute as to that. But quite frankly, this is a tragedy that's ripped apart a family and there is very little this Court can do to remedy that. This case is as much a trial of our mental health system as it is of a man. For 20 years, Mr. Galloway's family has sought long-standing permanent treatment for Mr. Galloway, and the fact that there may not be the funds available to pay for the mentally ill in the State of Indiana does not mean that we don't have mentally ill people in the State of Indiana.... I can pick apart about 20 mental health records that were submitted to this Court where I would have begged a mental health provider to keep Mr. Galloway long term in a civil commitment, but they have not. Mr. Galloway is able to take his medication when forced to do so in a very structured setting, but we have a 20 year history which shows when he

is not in that setting that he will not take his medication, that he will continue to have episodes and most concerning for this Court is that he will endanger others and himself. One of my options is not to say that he's committed for the rest of his life in a mental health institution. That would have been easy, but that's not one of my choices.... I cannot in good conscience allow someone with the severe mental health illness to return to the community and that is what has made this case so very difficult.... The Court does recommend that [Department of Correction] placement be close to home and that he receive mental health treatment during his incarceration.

Tr. p. 389–91. Galloway now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

Because Galloway admitted that he committed the alleged offense, the only issue we must consider is whether the record supported the trial court's conclusion that Galloway was guilty but mentally ill rather than not guilty by reason of insanity. Pursuant to Indiana Code section 35–41–3–6, "[a] person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense." "Mental disease or defect" is defined as "a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include an abnormality manifested only by repeated unlawful or antisocial conduct." I.C. § 35–41–3–6(b).

Our Supreme Court has articulated the parties' respective burdens of proof and standard of review as follows:

The "insanity defense" is an affirmative defense for which the burden of proof is on the defendant. The State must prove the offense, including mens rea, beyond a reasonable doubt but need not disprove insanity. Ind.Code Ann. § 35–41–4–1 (West 1998). "This Court has held that although the State is required to prove the defendant committed the act 'knowingly' this is not tantamount to requiring the State to prove that the defendant was 'sane.'" *Lyon v. State*, 608 N.E.2d 1368, 1370 (Ind.1993). As we said more recently:

[A]lthough [the defendant] offered evidence of mental illness, the State has no obligation to offer evidence which disproves mental illness in order to meet its burden of proving [the defendant] guilty beyond a reasonable doubt. To require the State to disprove mental illness would shift the burden of proof of insanity, controverting the General Assembly's placement of that burden on the defendant.

*Garner v. State*, 704 N.E.2d 1011, 1013–14 (Ind.1998) (citations omitted). To avoid responsibility for the crime proven by the State, the defendant must establish the defense by a preponderance of the evidence. Ind.Code Ann. § 35–41–4–1(b).

Whether or not a defendant can appreciate the wrongfulness of his conduct is a question for the trier of fact. A convicted defendant who claims his insanity defense should have prevailed at trial is in the position of one appealing from a negative judgment, and we will reverse only when the evidence is without conflict and leads only to the conclusion that the defendant was insane when the crime was committed. *Robinette v. State*, 741 N.E.2d 1162 (Ind.2001); *Rogers v. State*, 514 N.E.2d 1259 (Ind.1987). We will not reweigh the evidence or assess the credibility of witnesses but will consider only the evidence most fa-

vorable to the judgment and the reasonable and logical inferences to be drawn therefrom. *Metzler v. State,* 540 N.E.2d 606 (Ind.1989).

*Thompson v. State,* 804 N.E.2d 1146, 1148–49 (Ind.2004).

## II. Galloway's Mental Health

In considering Galloway's claim that the trial court erred by finding him to be guilty but mentally ill, we find our Supreme Court's opinion in *Thompson* to be instructive. The underlying facts in *Thompson* are as follows:

> Thompson does have a history of mental illness, a fact that manifested itself on February 12, 2001, when she went to the home of family friend Alisha Beeler to use the bath. After some time in the house, Thompson began to talk strangely to the children. Beeler knew Thompson was mentally ill, and when Thompson later went to her car for some bath items, Beeler locked the door behind her. When Thompson came back to the door, Beeler told her to leave. Thompson became irate and began kicking the door and then the window. The window broke, and Thompson entered the house by climbing through it. Thompson and Beeler exchanged words, then Thompson collected her things and departed through the front door.

> When police arrived at the scene, Thompson was driving away in her own vehicle. Officers stopped her and obtained her general information but then released her as only a suspect. Meanwhile, another officer interviewed Beeler and learned the foregoing facts. Thompson then telephoned Beeler several times, threatening to "shoot up" Beeler and her house. Thompson was taken into custody at her home about an hour and a half after the initial incident.

*Id.* at 1147–48. Thompson was charged with class D felony residential entry, and

she pleaded not guilty by reason of insanity. She stipulated to the truth of the facts as stated in the probable cause affidavit. All of the experts who examined Thompson were of the opinion that she was insane at the time of the incident, and there was no lay witness testimony conflicting with that conclusion.

Notwithstanding the overwhelming evidence establishing Thompson's insanity, the trial court found her guilty but mentally ill, and our Supreme Court affirmed the verdict, reasoning that a factfinder is free to disbelieve uncontradicted testimony:

> ... As a general rule, factfinders are not required to believe a witness's testimony even when it is uncontradicted. If judges and juries can disbelieve uncontradicted testimony about facts, they are surely entitled to decide whether to accept or reject testimony that represents a witness's opinion. The psychiatrists' reports in this case merely offer their opinions about Thompson's state of mind two days after she committed the crime at issue. As it happens, the trial judge to whom these opinions and the remainder of the evidence were submitted is among the most knowledgeable of Indiana's judicial officers on mental health matters. He was not persuaded, and we can think of little reason to second-guess that judgment.

*Id.* at 1149. In the end, our Supreme Court found that the trial court was entitled to focus on facts in the record apart from the uncontradicted expert testimony:

> ... in this case two experts submitted reports indicating that they believed that, due to her mental illness, Thompson could not appreciate the wrongfulness of her actions when she kicked in Beeler's window and entered the house. The trial judge was not persuaded by these opinions, however, in light of the rest of the record. When Thompson

was released from the hospital on February 9, only days before the incident, she had no active psychotic symptoms, no homicidal or suicidal ideations, and was calm and pleasant without agitation.

The trier of fact was entitled to prefer this evidence to psychiatric examinations conducted weeks or months later. In the course of the sentencing hearing, the judge provided some insight into why he did so. He cited Thompson's history of avoiding criminal responsibility through her illness, her conflicting stories about what happened to her medication, her decision to use illegal drugs and drink alcohol while on her medication, and lies she told one of the examining psychiatrists regarding that use of drugs and alcohol. The judge had concluded that she knew her actions were wrong but was using her illness to manipulate the system.

"The evidence on the issue of insanity clearly was in conflict and did not lead inexorably to a single conclusion." *Rogers* [*v. State*, 514 N.E.2d 1259, 1261 (Ind. 1987) ]. We find that based on the evidence presented, the trier of fact could have found that Thompson was mentally ill but able to distinguish right from wrong.

*Id.* at 1150.

Here, as in *Thompson*, the trial court provided insight into why it chose to find Galloway guilty but mentally ill. Through its findings of fact and conclusions of law and its comments at the sentencing hearing, the trial court explained that it reached its conclusion for the following reasons: Galloway's repeated refusals to take necessary medication; his abuse of drugs and alcohol; the danger that he poses to himself and society should he be acquitted; his demeanor on the day in question—specifically, the fact that he interacted with people appropriately on the day in question and ran routine errands,

shopped, conversed, and participated in a meal in a public restaurant, all without incident; and his cooperation with law enforcement following the crime.

The trial court acknowledged Galloway's lifelong struggle with a serious and debilitating mental illness, and stated multiple times that it had no doubts about the veracity of his illness. Notwithstanding his mental illness, however, the trial court found that Galloway had failed to establish the defense of insanity—in other words, he failed to prove by a preponderance of the evidence that he was unable to appreciate the wrongfulness of his conduct at the time he stabbed his grandmother.

Galloway asks us to address each of the trial court's bases for its conclusion separately. We need not do so, however, as we are compelled by *Thompson* to affirm if there is any evidence whatsoever supporting the verdict, no matter how slight. Among other things, the trial court found Galloway's normal-seeming behavior on the day of the incident to be evidence of his sanity. Specifically, he interacted with people in socially acceptable ways, ran errands, shopped, pumped gas into a vehicle, and had lunch at a restaurant, all without incident. At the close of the outing, his grandmother said that it had been a wonderful day, and Galloway's aunt later testified that "everybody was happy" after the outing. Tr. p. 43–44, 58.

Additionally, within seconds of the stabbing, Galloway realized what he had done and the practical and legal consequences of his conduct. He appeared lucid and in control of his faculties during his interactions with police, and police officers noted on his intake form that he displayed no signs of being suicidal, in disarray, or disoriented. During a police interview, Galloway was polite and cooperative and responded logically to questions.

Galloway directs our attention to the undisputed lay testimony from his rela-

tives who knew him the best, all of whom testified that he had been behaving abnormally all day. Additionally, he had not slept the night before, had uncharacteristically yelled at his best friend the morning of the incident, and had spent the week leading up to the incident fearing a ghost in his grandmother's home and sleeping on the floor in his parents' bedroom. Finally, Galloway emphasizes the undisputed expert testimony that he is mentally ill and points out that two of the three experts found that he was insane at the time of the incident, while the third recanted his initial opinion of sanity and declined to form an opinion one way or another upon learning all of the relevant facts.

We sympathize greatly with Galloway's position. That said, we believe that we are compelled by *Thompson* to affirm. Our Supreme Court has said that trial courts are free to disbelieve expert and lay testimony, even when it is uncontradicted, and here, the trial court chose to do so. Instead, it focused on Galloway's outward demeanor on the day in question—notwithstanding the undisputed evidence that despite his normal seeming behavior, he was, in fact, delusional on that day, believing he was reading his father's mind and that his grandmother was possessed by the devil. Although Galloway's conduct does not foreclose the possibility that he was legally insane at the time of the killing, we are compelled by *Thompson* to find that it was reasonable for the trial court to conclude that he behaved normally because he was, in fact, sane.

The judgment of the trial court is affirmed.

BAILEY, J., and ROBB, J., concur.