

FILED

May 18 2020, 2:44 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



IN THE

# Indiana Supreme Court

Supreme Court Case No. 20S-CR-313

## Jesse L. Payne,
*Appellant (Defendant),*

—v—

## State of Indiana,
*Appellee (Plaintiff).*

---

Argued: October 15, 2019 | Decided: May 18, 2020

Appeal from the Parke Circuit Court,
No. 61C01-0505-FB-79
The Honorable Sam A. Swaim, Judge

On Petition to Transfer from the Indiana Court of Appeals,
No. 18A-CR-1359

---

**Opinion by Justice Goff**

Chief Justice Rush and Justice David concur.
Justice Massa dissents with separate opinion in which Justice Slaughter joins.

**Goff, Justice.**

Our criminal legal system rests on the basic assumption that humans are rational agents of free will with the ability to exercise conscious choice in their everyday actions. So, when an individual possesses "sufficient mental capacity to fully comprehend the character and consequences of a criminal act," the law holds him responsible accordingly. *Goodwin v. State*, 96 Ind. 550, 563 (1883). The corollary to this maxim holds that "mental unsoundness does not merely mitigate the offence but excuses it." *Id.* at 576. That is, a person is not responsible for his conduct "if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense." Ind. Code § 35-41-3-6(a) (2019).

The defendant here has long suffered from acute mental illness, having spent most of his life under psychiatric care for chronic paranoid schizophrenia and delusional disorder. After confessing to burning down two bridges (and attempting to burn another), he spent the next **eleven years** undergoing competency restoration before standing trial, only to be found guilty but mentally ill (GBMI)[1] by a jury and sentenced to the maximum aggregate term of ninety years in prison—all despite expert consensus that he was legally insane.

Because the State presented insufficient demeanor evidence with which to rebut both the unanimous expert opinion **and** Payne's well-documented history of mental illness, we reverse the GBMI conviction to find him not guilty by reason of insanity (NGRI). On remand, we instruct the trial court, upon the State's petition, to hold a hearing for Payne's involuntary commitment under Indiana Code section 35-36-2-4.

---

[1] A GBMI verdict requires an evaluation and treatment of the defendant's mental illness during incarceration "in such a manner as is psychiatrically indicated," but otherwise imposes a criminal sentence "in the same manner as a defendant found guilty of the offense." I.C. § 35-36-2-5(a), (c).

## Factual and Procedural History

In 2005, the State charged then thirty-five-year-old Jesse Payne with two counts of arson, accusing him of burning down two of Parke County's historic landmarks: the Bridgeton Covered Bridge in 2005 and the Jeffries Ford Covered Bridge in 2002. Payne also stood accused of the attempted 2005 arson of the Mansfield Covered Bridge. The State supplemented these charges with a habitual-offender enhancement. The trial court found him incompetent to stand trial until 2016. At his jury trial two years later, Payne asserted the insanity defense. Three court-appointed mental-health experts—two psychiatrists and a psychologist—unanimously concluded that he suffered from paranoid schizophrenia and delusional disorder, rendering him unable to distinguish right from wrong. Despite this expert unanimity, the jury rejected the insanity defense, finding Payne GBMI on all counts.

The trial court entered judgment of conviction and sentenced Payne to the Department of Correction for the maximum allowed by statute: twenty years for each count with a thirty-year enhancement for his habitual-offender status—each sentence to be served consecutively for an aggregate term of ninety years.

The Court of Appeals affirmed, holding that the demeanor evidence of Payne's deliberate, premeditated conduct was sufficient to support the jury's conclusion that he was sane at the time of his offenses, despite expert opinion to the contrary.[2]

---

[2] The panel also (1) held that the trial court did not abuse its discretion in admitting Payne's polygraph, custodial statements, and confession; (2) affirmed Payne's ninety-year sentence under Indiana Appellate Rule 7(B); (3) affirmed the trial court's denial of his motion to transfer venue; and (4) affirmed the trial court's finding that the 2005 arson and attempted arson amounted to two separate offenses rather than a single episode of criminal conduct. Payne contests neither the third nor fourth issues on transfer, and we need not resolve the first or second issues because of our decision to reverse on the issue of insanity.

## Standard of Review

On review of a GBMI verdict, this Court will affirm the trial court's decision "unless 'the evidence is without conflict and leads only to the conclusion that the defendant was insane when the crime was committed.'" *Barcroft v. State*, 111 N.E.3d 997, 1002 (Ind. 2018) (citation omitted). We do "not reweigh the evidence or assess the credibility of witnesses but will consider only the evidence most favorable to the judgment." *Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004). And while the factfinder's determination "that 'a defendant was not insane at the time of the offense warrants substantial deference,'" *Barcroft*, 111 N.E.3d at 1002 (citation omitted), the inferences drawn by the factfinder from the evidence at trial must be "reasonable and logical," *Thompson*, 804 N.E.2d at 1149.

## Discussion and Decision

In *Barcroft*, this Court affirmed the defendant's GBMI conviction for the murder of her family pastor, citing her "deliberate, premeditated conduct in the weeks and days leading up to the crime," along with her efforts to avoid detection of her criminal conduct during and after the crime. 111 N.E.3d at 1005. This "evidence of Barcroft's demeanor—taken together with the flaws in the expert opinion testimony and the absence of a well-documented history of mental illness—was sufficient to support an inference of sanity." *Id.* at 1008.

In distinguishing this case from *Barcroft*, Payne argues that evidence of his insanity "is overwhelming," a finding confirmed by each of the court-appointed experts. Appellant's Br. at 27. And "in light of his chronic schizophrenia and fixed delusion," he insists, evidence of his demeanor is simply "not probative of sanity." *Id.* at 20. To affirm the GBMI verdict, he contends, would conflict with the holding in *Barcroft*, effectively creating an "impossible standard of review." Pet. to Trans. at 17.

We agree.

# I. Absent conflict in expert opinion, Payne's long and well-documented history of mental illness clearly supports a finding of insanity.

A defendant pleading insanity bears the burden, by a preponderance of the evidence, of proving that affirmative defense. I.C. § 35-41-4-1(b) (2017). And the factfinder, whether judge or jury, may consider all relevant evidence in reaching a verdict. *Barcroft*, 111 N.E.3d at 1002–03. This evidence may include testimony from expert witnesses, proof of the defendant's demeanor at the time of the offense, and the defendant's history of mental illness. *Id.* at 1003, 1008.

Here, the evidence leads only to the conclusion that Payne was insane at the time he committed the offenses.

## A. The unanimous expert opinion laid a solid foundation for establishing Payne's insanity.

Mental-health experts, whether retained by the parties or appointed by the court, offer their opinions on a defendant's mental condition to assist the factfinder in deciding whether the defendant was insane at the time of the offense. *Id.* at 1003. Expert opinion is "purely advisory" and a factfinder may discredit their testimony, or disregard it completely, in lieu of other probative evidence. *Id.* Still, experts are "central to a determination of insanity." *Id.* And their opinion that the defendant was insane at the time of the offense offers "a strong justification for raising the insanity defense" to begin with. *Id.* (citation omitted).

Here, all three **court-appointed** experts—two psychiatrists and a psychologist—unanimously opined that Payne suffered from paranoid schizophrenia and delusional disorder. Dr. Ashan Mahmood testified that "the records have been quite consistent" in showing Payne's "long term mental illness," an illness accompanied by a "pattern of delusions, hallucinations, non-adherence to medications," and psychiatric treatment. Tr. Vol. 5, pp. 74–75. Payne's schizophrenia and delusional disorder, Dr. Mahmood opined, ultimately precluded him from appreciating the

wrongfulness of his actions at the time of the offenses. The other two experts, Dr. Rebecca Mueller and Dr. Jeffrey Huttinger, likewise concluded that Payne was legally insane when he committed the offenses. And Dr. Huttinger further explained that Payne's demeanor, though superficially normal to a casual observer, was not necessarily inconsistent with schizophrenia when his actions were "driven by some type of delusion." *Id.* at 112–18.

In *Barcroft*, as in this case, all three mental-health experts testified that the defendant was legally insane, unable to appreciate the wrongfulness of her actions at the time of the crime. 111 N.E.3d at 999–1000. The Court, however, found several "flaws" and "inconsistencies" in the experts' opinions. *Id.* at 1008. Conflicting diagnoses, inadequate document review, deficient psychiatric evaluations, and other issues, the Court concluded, "support[ed] the trial court's rejection of Barcroft's insanity defense." *Id.* at 1006–08.

The record here, by contrast, reveals no discrepancies in diagnosis, no deficiency in evaluations, and no other substantive issues with the experts' opinion. To be sure, Dr. Mahmood testified that he "d[id] not have a very strong opinion" of whether Payne "appreciated the wrongfulness of his conduct" at the time of the 2005 arson. Tr. Vol. 5, pp. 92–93. But this uncertainty arose in part from the comparatively stronger symptoms of psychosis Payne demonstrated at the time of the 2002 arson. Regardless, while conflicting expert testimony may create a presumption of sanity, a "conflict **does not exist**" when "one or several experts testify that the defendant was insane" and "another expert testifies that he or she is unable to give [such] an opinion" or, as here, a "strong" opinion. *See Galloway v. State*, 938 N.E.2d 699, 710 (Ind. 2010) (emphasis added). *See also Lawson v. State*, 966 N.E.2d 1273, 1279 (Ind. Ct. App. 2012) (same), *trans. denied*.

In short, this unanimous expert opinion laid a solid foundation for establishing Payne's insanity. And the lack of "flaws" or "inconsistencies" in this expert opinion lends strong support to this conclusion. *Cf. Barcroft*, 111 N.E.3d at 1006–08.

## B. Payne's well-documented history of mental illness deprives any relevant demeanor evidence of its probative value.

When, as here, there is no conflict in expert opinion, there must be other probative evidence from which to infer the defendant's sanity. *Id.* at 1003. This may include evidence of the defendant's demeanor at the time of the offense. *Id.* This evidence, which centers on the defendant's actions and statements, may sufficiently prove the defendant's sanity, even when expert witnesses conclude otherwise. *Id.* at 1004.

In *Barcroft*, this Court cited the defendant's "premeditated conduct in the weeks and days leading up to the crime," her purchase of a handgun and ammunition, her preparation of farewell letters to members of her family, and her overall "calculated attempt to evade detection or to obscure her identity" on the day of the murder. *Id.* at 1005. This "ample demeanor evidence," the Court concluded, reasonably "**support[ed]** the trial court's rejection of Barcroft's insanity defense." *Id.* (emphasis added).

Here, the prosecutor at trial introduced demeanor evidence to "show consciousness of guilt," including Payne's effort to avoid witnesses by acting late at night, his deceptive explanation to police that he had purchased the fuel found in his car for camping, and his attempt at establishing an alibi by presenting convenience store receipts. Tr. Vol. 5, pp. 199, 202–04. **Standing alone**, this evidence **could**, as in *Barcroft*, reasonably lead to an inference that Payne appreciated the wrongfulness

of his conduct at the time of the offense.[3] Demeanor evidence, however, "must be considered as a whole, in relation to all the other evidence." *Galloway*, 938 N.E.2d at 714. *See also Barcroft*, 111 N.E.3d at 1004–08 (weighing the totality of the evidence). An analytical approach to the contrary "would give carte blanche to the trier of fact and make appellate review virtually impossible." *Galloway*, 938 N.E.2d at 714 (citing cases in which trial courts have found evidence of flight from police **and** evidence of cooperation with police **both** probative of a defendant's sanity). *See also Barcroft*, 111 N.E.3d at 1005 (recognizing that the defendant's decision to spare the life of a witness to the crime could reflect **either** insanity, as the experts opined, **or** "an understanding that killing is wrong"). It would also render meaningless the statutory requirement that the trial court appoint two or three "competent" and "disinterested" mental-health professionals "who have expertise in determining insanity." *See* I.C. § 35-36-2-2(b) (2019).

To be sure, "demeanor evidence may sufficiently prove a defendant's sanity, even when expert and lay witnesses conclude otherwise." *Barcroft*, 111 N.E.3d at 1004. But analysis of that evidence forms only part of our inquiry. We must also look to the defendant's history of mental illness—an equally relevant "circumstance that a fact-finder may consider in evaluating an insanity defense." *Id.* at 1008 (citation omitted). And "when a defendant has a serious and well-documented mental disorder, such as

---

[3] This demeanor evidence, Payne contends, does **not** show that he "appreciated the moral wrongfulness of his actions," as the proper legal standard requires. Pet. to Trans. at 17–18. *See Hill v. State*, 252 Ind. 601, 614, 251 N.E.2d 429, 437 (1969) (adopting the "wrongfulness" standard under the ALI's Model Penal Code test for insanity to protect the defendant who "appreciated the fact that his conduct was criminal but because of a delusion, believed it to be morally justified"); I.C. Ann. § 35-41-3-6(a) cmt. at 227 (West 1978) (noting that this section codified the "[MPC] test for insanity that was adopted by the Indiana Supreme Court in *Hill v. State*"); Pub. L. No. 184-1984, § 1, 1984 Ind. Acts 1501, 1501 (repealing the volitional, or "irresistible impulse," prong of the insanity test but leaving in place the existing "wrongfulness" standard), *codified at* I.C. § 35-41-3-6(a). Whatever the merits of this argument, we find it unnecessary to resolve, as Payne's well-documented and consistent history of mental illness leads us "only to the conclusion that [Payne] was insane when the crime was committed." *See Galloway*, 938 N.E.2d at 710 (citation omitted).

schizophrenia," the probative value of demeanor evidence effectively dissolves. *Galloway*, 938 N.E.2d at 713 (citation omitted).

In *Barcroft*, this Court pointed to "the **absence** of a well-documented history of mental illness" to support an inference of sanity. 111 N.E.3d at 1008 (emphasis added). With only "periodic psychiatric assessments on an outpatient basis" and with no formal diagnosis of "schizophrenia, delusional disorder, or other acute mental illness," Barcroft's "questionable" history of mental illness (as her medical record described it) offered little evidentiary support for her insanity defense. *Id.*

Unlike Barcroft's sparse medical record, Payne's long history of mental illness is consistent and thoroughly documented. Payne first received mental-health treatment at the age of thirteen, inaugurating what would become a lifetime of involuntary commitments and psychiatric hospitalizations. Diagnosed with chronic paranoid schizophrenia in 2000, Payne has since been treated with a veritable cocktail of antipsychotic medications, including Risperdal, Prolixin, and Haldol. Mental-health evaluations over the ensuing decade regularly affirmed his schizophrenia diagnosis, reporting on a consistent pattern of hallucinations and delusional episodes. Doctors have also diagnosed Payne with polysubstance abuse and anti-social personality disorder, further evidence of amplified mental illness.

Critically, the record reveals no deviation from these findings over the decades. Even when providers in 2016 deemed Payne competent to stand trial, there was no change to his schizophrenia diagnosis. As his psychiatrist explained, Payne fully understood the charges against him and could effectively participate in his defense only because "his psychotic symptoms [were] well controlled" by adhering to a strict regimen of antipsychotic medications. Ex. Vol. 7, p. 101.

Even then, Payne's delusional worldview persisted. Indeed, the trial transcript reveals that, despite the repression of any outward psychotic symptoms, he possessed little if any rational thought. With no obvious evidence of feigning, Payne testified to an elaborate conspiracy involving criminal activity and obstruction of justice by various government officials. These officials, he attested, had threatened, "terrorized," and

physically abused him as a "strategy to stop [him] from exposing" their misdeeds. Tr. Vol. 4, pp. 228, 245; Tr. Vol. 5, p. 7; Ex. Vol. 6 of 8, p. 87. Driven by personal "morals and ethics," Payne considered himself an "informant," dutybound to report these officials to the county prosecutor "for the future of our children, for our present state, [and] for society." Tr. Vol. 5, p. 3.

This **well-documented and consistent** history of mental illness, along with the unanimous expert opinion, fully undermines the probative value of any relevant demeanor evidence. And with no "reasonable [or] logical" inferences to draw from the evidence in support of the verdict, *see Thompson*, 804 N.E.2d at 1149, we come "only to the conclusion that [Payne] was insane when the crime[s were] committed," *see Galloway*, 938 N.E.2d at 710 (citation omitted). *Cf. Lawson*, 966 N.E.2d at 1282 (opining that the "lack of a long-standing history of mental illness," though not dispositive, may support an inference of sanity). To be sure, the "factfinder's determination that 'a defendant was not insane at the time of the offense warrants substantial deference from' an appellate court." *Barcroft*, 111 N.E.3d at 1003 (citation omitted). But this standard does not and should not deprive this Court of meaningful appellate review. To conclude otherwise would amount to an abdication of our constitutional duty. *See* Ind. Const. art. 7, § 4.

# Conclusion

Despite its reputation as a "get out of jail free" card,[4] an insanity acquittal in Indiana requires the prosecuting attorney to petition the trial court for an involuntary commitment proceeding. *See* I.C. § 35-36-2-4(a) (2019). The trial court may then order a defendant committed to "an appropriate facility" or "therapy program" if it finds by "clear and convincing evidence" that the defendant is "mentally ill and either dangerous or gravely disabled." I.C. § 12-26-2-5(e); I.C. § 12-26-7-5(a). A regular commitment continues until the individual is "discharged from the facility" or "released from the therapy program," or when the court orders a termination or release. I.C. § 12-26-7-5(b). As a further safeguard, the superintendent of the commitment facility, along with the patient's attending physician, must conduct and file with the court periodic reviews throughout the commitment. I.C. § 35-36-2-4(d); I.C. § 12-26-15-1.

Notably, Indiana, like most states, imposes **no limit on the duration of a commitment**. So long as "the nature and duration of the detention [are] tailored to reflect pressing public safety concerns," the state might continue the commitment indefinitely, even if the person "has regained sanity." *Foucha v. Louisiana*, 504 U.S. 71, 87–88 (1992) (O'Connor, J., concurring). *See also Jones v. United States*, 463 U.S. 354, 361–70 (1983) (holding that a defendant who successfully establishes the insanity

---

[4] Our case law implicating the insanity defense reflects this stubbornly persistent view. *See Georgopulos v. State*, 735 N.E.2d 1138, 1141 (Ind. 2000) (quoting skeptical prospective jurors who, during voir dire, referred to the insanity defense as a "cop-out," a "loophole," and "a way to get a lesser plea"); *Caldwell v. State*, 722 N.E.2d 814, 816–17 (Ind. 2000) (finding reversible error when the trial court failed to either admonish the jury or give the defendant's tendered instructions after the prosecutor implicitly argued in closing that the defendant would walk free if he were found NGRI); *Dipert v. State*, 259 Ind. 260, 262, 286 N.E.2d 405, 407 (1972) (concluding that, while a defendant claiming insanity is typically "not entitled to an instruction as to what post-trial procedures are available to determine whether he should be released or subjected to confinement in a mental institution," the defendant "will be entitled to inform the jury of such procedures where an erroneous view of the law on this subject has been planted in their minds").

defense may be committed to a mental institution based on the insanity judgment alone).

Because the State presented insufficient demeanor evidence with which to rebut the unanimous expert opinion and evidence of Payne's well-documented history of mental illness, we reverse the GBMI conviction to find Payne NGRI. On remand, we instruct the trial court to hold a hearing on the State's petition for Payne's commitment to "an appropriate facility" or "therapy program." *See* I.C. § 35-36-2-4(a); I.C. § 12-26-6-8(a); I.C. § 12-26-7-5(a).

Rush, C.J., and David, J., concur.
Massa, J., dissents with separate opinion in which Slaughter, J., joins.

ATTORNEY FOR APPELLANT
Stacy R. Uliana
Bargersville, Indiana

ATTORNEY FOR APPELLEE
Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana

**Massa, J., dissenting.**

I respectfully dissent from this opinion fundamentally misapplying the time-honored standard of review this Court recently reaffirmed in *Barcroft v. State*, 111 N.E.3d 997 (Ind. 2018). Today, the Court reverses a unanimous jury verdict rejecting the insanity defense, despite acknowledging the "'substantial deference'" we should show that decision. *Ante*, at 4 (quoting *Barcroft*, 111 N.E.3d at 1002). Instead, because we shouldn't undermine this factfinder's determination "'unless the evidence is without conflict and leads only to the conclusion that the defendant was insane when the crime was committed,'" *ibid.* (quoting *Barcroft*, 111 N.E.3d at 1002) (internal quotation marks omitted), we should affirm.

The Court plainly states that evidence of Payne's demeanor—that is his behavior before, during, and after the offenses—conflicts with the expert testimony and his documented history of mental illness. Payne strived to "avoid witnesses by acting late at night." *Ibid.* at 7; *see Barcroft*, 111 N.E.3d at 1005 (Barcroft "planned to confront the pastor during the early morning hours, before the day's activities had started and to avoid potential witnesses."). Payne deceptively explained "to police that he had purchased the fuel found in his car for camping." *Ante*, at 7; *see Barcroft*, 111 N.E.3d at 1005 (Barcroft kept her gun "concealed in her front pocket" while talking with a witness.). And Payne tried to establish "an alibi by presenting convenience store receipts." *Ante*, at 7; *see Barcroft*, 111 N.E.3d at 1005–06 (Barcroft remarked to a detective "that she had 'actually planned on not getting caught.'").

"**Standing alone**," the Court opines, "this evidence **could**, as in *Barcroft*, reasonably lead to an inference that Payne appreciated the wrongfulness of his conduct at the time of the offense." *Ante*, at 7–8. But under our deferential standard, this demeanor evidence indicative of sanity—even "standing alone"—**compels** our affirmance. The longstanding test recognized by the Court bears repeating: we must affirm "'unless the evidence is without conflict and leads only to the conclusion that the defendant was insane when the crime was committed.'" *Ibid.* at 4 (quoting *Barcroft*, 111 N.E.3d at 1002) (internal quotation marks omitted). *See generally Galloway v. State*, 938 N.E.2d 699, 710 (Ind. 2010); *Thompson v.*

*State*, 804 N.E.2d 1146, 1149 (Ind. 2004); *Robinette v. State*, 741 N.E.2d 1162, 1167 (Ind. 2001); *Weeks v. State*, 697 N.E.2d 28, 29 (Ind. 1998); *Gambill v. State*, 675 N.E.2d 668, 672 (Ind. 1996); *Barany v. State*, 658 N.E.2d 60, 64 (Ind. 1995); *Metzler v. State*, 540 N.E.2d 606, 610 (Ind. 1989); *Rogers v. State*, 514 N.E.2d 1259, 1260 (Ind. 1987); *Mason v. State*, 451 N.E.2d 661, 663 (Ind. 1983); *Thomas v. State*, 420 N.E.2d 1216, 1218 (Ind. 1981).

The Court ultimately does not—and cannot—conclude that the evidence of Payne's insanity is without conflict. Instead, it asserts that there is "no 'reasonable [or] logical' inferences to draw from the evidence in support of the verdict." *Ante*, at 10 (quoting *Thompson*, 804 N.E.2d at 1149). But as noted above through the Court's own words, the jury could reasonably and logically infer sanity based on Payne's behavior before, during, and after the crimes. Indeed, the Court notes that *Galloway* cited "cases in which trial courts have found evidence of flight from police **and** evidence of cooperation with police **both** probative of a defendant's sanity" and that *Barcroft* recognized "that the defendant's decision to spare the life of a witness to the crime could reflect **either** insanity, as the experts opined, **or** 'an understanding that killing is wrong.'" *Ibid.* at 8 (citing *Galloway*, 938 N.E.2d at 714; *Barcroft*, 111 N.E.3d at 1005). That demeanor evidence can often lead to different inferences underscores why we should leave this determination undisturbed.

In the end, the Court discounts the evidence of Payne's demeanor, elevates the documentation of his mental illness, reweighs the conflicting evidence, and supplants the factfinder's determination. I fear the Court's opinion, by flouting our standard of review, quiets the immutable trust we place in factfinders and permits appellate courts to inconsistently establish rejected insanity defenses. Yes, our appellate review must mean something. *See ibid.* at 10 ("[T]his standard does not and should not deprive this Court of meaningful appellate review."). But that oversight must uniformly flow from the proper standard of review. Because today's opinion does not, I respectfully dissent.

Slaughter, J., joins.