# FOR PUBLICATION



**FILED**

May 10 2012, 9:15 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JOHN C. BOHDAN**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**GEORGE P. SHERMAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| LATISHA A. LAWSON, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 02A03-1107-CR-350 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Frances C. Gull, Judge
Cause No. 02D05-1012-FA-64

**May 10, 2012**

**OPINION - FOR PUBLICATION**

**BARNES, Judge**

**Case Summary**[1]

Latisha Lawson appeals her convictions for murder, Class C felony neglect of a dependent, Class D felony neglect of a dependent, and Class D felony battery. We affirm.

**Issue**

The sole issue before us is whether there is sufficient evidence to support the jury's rejection of Lawson's insanity defense.

**Facts**

Lawson was the mother of two children: K.K., born in 2000, and J.K., born in 2007. Lawson lived with the father of the children, Lawrence King, until October 2009, when the two split up. King had known Lawson for fifteen years and had never noticed any signs that she had a "profound mental illness." Tr. p. 622. Additionally, Lawson had never previously received any mental health treatment.

After splitting up with King, Lawson and her children moved in with Natasha Hawkins and her three children. Lawson, who had always been steadily employed, quit her job after moving in with Hawkins. She also began homeschooling K.K. Lawson later explained that she believed God or "the Lord" had told her to quit her job and move in with Hawkins. Id. at 743. While she was living with Hawkins, other persons who came into contact with Lawson did not notice any signs of mental illness or unusual

---

[1] We held oral argument in this case on April 2, 2012, at the University of Notre Dame Law School. We thank the Law School for its hospitality, and counsel for both parties for their able presentations and participation in this "traveling" oral argument.

2

behavior. One person trusted Lawson enough to allow her to babysit her own children at times.

Behind closed doors, however, Lawson was frequently battering K.K. with a belt and extension cords, sometimes with enough force to leave permanent scars. Lawson began telling K.K. that J.K. was possessed by a demon, whom Lawson believed was named Marzon. Lawson believed that J.K.'s physical appearance and bone structure was changing as a result of his possession; Lawson also managed to convince K.K. that these changes were occurring. At some point, Lawson claims that God revealed a plan to exorcise the demon from J.K. The plan required forcing J.K., along with K.K. and Hawkins's children,[2] to ingest a combination of "blessed" oil (i.e., olive oil over which Lawson prayed) and vinegar. Id. at 754. Hawkins agreed to this plan, and Lawson asserts that God told her the specific day on which to carry it out.

On that day, which appears to have been in November 2009, all of the children were given the oil and vinegar mixture, which caused them to vomit. J.K. fought against drinking the mixture, shaking his head no, crying, and attempting to spit it out. Hawkins helped hold J.K. down while he was given the mixture. Lawson and Hawkins, who apparently showed no signs of anger during the process, prayed out loud over J.K. The other children could not understand what the adults were saying for the most part, and Lawson claimed that she was speaking in tongues at that time. In order to force J.K. to ingest the oil and vinegar mixture, Lawson held her hand over his mouth for as long as

---

[2] Apparently, Lawson believed that the other four children were possessed by demons as well, though not to the same extent as J.K.

five to ten minutes. Eventually, Lawson noticed that J.K. stopped breathing, and she told K.K. to say "bye" to him. Id. at 318. J.K. died at that time from suffocation.[3] Lawson later claimed to have been shocked that J.K. had died and that she expected him to come back to life at some point.

After J.K. died, his body was placed on Hawkins's bed, where it remained for approximately one month while Lawson and Hawkins continued sleeping in the bed next to it. Lawson told one of Hawkins's children that she was "doing things for God" that would lead to J.K. coming back to life, which the child considered "crazy." Id. at 543. Lawson also purchased some clothes for J.K. after he died. Later, J.K.'s body was moved into a closet, and K.K. noticed a bad smell coming from the closet. Lawson and Hawkins eventually stuffed J.K.'s body into a plastic bin. Lawson forbade K.K. from discussing J.K.'s death, saying that she (Lawson) would go to jail if anyone found out about it. Lawson also sometimes forced the children in the house either to look at or touch J.K.'s body as a form of punishment.

Lawson essentially broke off all contact with her mother after moving in with Hawkins, even though she previously had had frequent contact with her. Lawson's mother eventually contacted the Department of Child Services ("DCS") and the Ft.

---

[3] There was evidence that J.K. had a broken bone in his neck, and a pathologist believed that the break must have occurred during his life, indicating that pressure had been applied to his neck and he had been strangled to death. Lawson denies that any strangulation of the neck occurred and the bone break must have occurred after death, but she does admit to having suffocated J.K. by placing her hand over his mouth for at least five to ten minutes. None of the other testifying eyewitnesses to J.K.'s death—K.K. and Hawkins's three children—described Lawson as putting her hand around his neck, as opposed to over his mouth. In any event, Lawson makes no argument, aside from her insanity claim, that there is insufficient evidence of knowingly or intentionally killing J.K.

4

Wayne Police Department with her concerns over Lawson and the children's situation. In September 2010, a Ft. Wayne police officer went to Lawson and Hawkins's apartment to perform a welfare check. The officer spoke to Lawson and did not notice any signs that she was suffering from a mental health issue. Lawson also told the officer that J.K. was staying with an aunt at the time. After walking through the apartment and finding nothing unusual, the officer left and filed a report with DCS, which evidently did not follow up on the report. Lawson also told other persons, after J.K.'s death, that he was staying with other family members.

Lawson moved out of Hawkins's apartment at the end of November 2010. She brought the plastic bin containing J.K.'s body with her when she moved into the home of an acquaintance, Yvonne Hill. Lawson told Hill first that J.K. was "somewhere safe," and later said that he had been adopted. Id. at 266. Hill described her conversations with Lawson as "normal." Id. at 268. After a short time living with Hill, Lawson moved into a home provided by a local pastor. Again, she brought the plastic bin with her, keeping it by her bedside.

On December 20, 2010, Ft. Wayne police officers performed a welfare check on Hawkins and her children at her apartment. Hawkins revealed to the officers that a baby had been killed in her apartment approximately one year before and placed into a bin. Police then were able to locate Lawson. At first, Lawson told police that her son had been adopted, but she declined to say by whom. Eventually, Lawson gave police a statement describing her belief that J.K. had been possessed, the exorcism attempt, and

5

his death. Lawson consented to a search of the residence where she had been staying, and police found the plastic tub with J.K.'s partially mummified body inside.

On December 28, 2010, the State charged Lawson with Class A felony battery, Class A felony neglect of a dependent, Class C felony neglect of a dependent, Class D felony neglect of a dependent, and Class D felony battery. The first two charges were with respect to J.K.'s death, and the last three charges were with respect to Lawson's treatment of K.K., including physically and mentally abusing her and forcing her to drink the oil and vinegar. On January 28, 2011, the State added a charge of murder for J.K.'s death.

Lawson filed notice that she intended to rely upon a defense of insanity. She accordingly was examined by two court-appointed experts: Dr. Kevin Wieland, a clinical psychologist, and Dr. Herbert Trier, a psychiatrist. Dr. Wieland's examination consisted of interviews and tests totaling seven to eight hours, while Dr. Trier's examination consisted of a forty-five minute interview and review of the background investigation of the case. At Lawson's jury trial held on May 24-27, 2011, Dr. Wieland was asked whether he had an opinion on whether Lawson was "sane or insane at the time of the offense," and he responded, "My opinion [sic] that Ms. Lawson was able to determine right from wrong regardless of a delusional process she may have." Id. at 443-44. Dr. Wieland further explained that his opinion was "to a medical degree of certainty" for the following reasons:

Based on all of the psychological measures and the clinical interview my opinion comes from a belief that she did [sic] in order to help her child. And that was her main goal of even doing the behavior at all. And so because of that her belief at that particular time was that her actions would help her child not harm. So she has a belief that helping is better than harming. She also has a deep belief in God and spirituality and cited on numerous occasions throughout the interview that God tries to influence for good rather than evil. And she talked a lot about good verses [sic] evil in the interview. And from that we can take that she has a strong belief between right, wrong, good, evil and that's where that opinion comes from.

Id. at 446-47.

Dr. Wieland also testified that based upon Lawson's description of events to him, "she definitely demonstrated the ability to make choices and to make choices in a right or wrong manner at that time." Id. at 451. He also believed there was "no evidence that she was unable to appreciate the wrongfulness of her conduct at the time of the offense." Id. at 473. After questioning by the court and the parties, the jury submitted a question asking Dr. Wieland whether "an insane person [can] in any way tell the difference between right and wrong." Id. at 478. Dr. Wieland responded, "Yes. Just because somebody is considered insane doesn't mean that they lose the ability [sic] ascertain right and wrong although many times they do." Id.

Dr. Trier testified that he "felt that she was not sane at the time of the offense." Id. at 483. He also stated that a person with a delusional mental illness "might know right from wrong in a number of circumstances but not in the area where the delusions concerned." Id. at 488-89. He also noted that "a person can be acting normal and have a

7

delusional disorder . . . that happens all the time." Id. at 491-92. Dr. Trier believed that Lawson may have had either psychotic depression with delusions or schizophrenic disorder with delusions. Neither Dr. Wieland nor Dr. Trier gave any indication that they suspected Lawson of malingering.[4]

The jury was instructed that it had the option of finding Lawson not guilty, not responsible by reason of insanity, guilty, or guilty but mentally ill. It returned a verdict of guilty for all six counts. The trial court entered judgments of conviction on four of the six counts: murder, Class C felony neglect of a dependent, Class D felony neglect of a dependent, and Class D felony battery. After being sentenced to an aggregate term of sixty-one years, Lawson now appeals.

## Analysis

Lawson's sole argument on appeal is that the jury erred in rejecting her insanity defense.[5] Even when the State proves every element of a charged offense beyond a reasonable doubt, a defendant can avoid criminal responsibility for that offense by raising and proving an insanity defense. Galloway v. State, 938 N.E.2d 699, 708 (Ind. 2010). Indiana Code Section 35-41-3-6 states:

> (a)    A person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense.

---

[4] Any written reports prepared by Dr. Wieland or Dr. Trier based on their examinations of Lawson were not introduced into evidence.

[5] Lawson's argument on this point focuses primarily upon J.K.'s death.

(b)     As used in this section, "mental disease or defect" means a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include an abnormality manifested only by repeated unlawful or antisocial conduct.

The defendant must prove an insanity defense by a preponderance of the evidence. Ind. Code § 35-41-4-1(b).

Because Lawson bore the burden of establishing her insanity defense, she is now appealing from a negative judgment. See Galloway, 938 N.E.2d at 709. When reviewing a negative judgment, this court will not reweigh evidence, reassess witness credibility, or disturb reasonable inferences made by the trier of fact, even if more reasonable inferences arguably could have been made. Id. A defendant appealing a rejection of his or her insanity defense must establish to this court that the evidence is without conflict and leads only to the conclusion that he or she was insane when the crime was committed. Id. "Although this standard of review is deferential, it is not impossible . . . . An impossible standard of review under which appellate courts merely 'rubber stamp' the fact finder's determinations, no matter how unreasonable, would raise serious constitutional concerns because it would make the right to an appeal illusory." Id.

When mental health experts who have examined a defendant offer conflicting opinions on whether a defendant was insane at the time of the offense, i.e. where one or more experts testify that the defendant was insane while others testify that he or she was sane, such conflicting testimony generally "is sufficiently probative of sanity." Id. at 710. Even when the experts unanimously agree that a defendant was insane when a

9

crime was committed, a jury may still reject an insanity defense if there is "other evidence of probative value from which a conflicting inference of sanity can be drawn." Id. at 712. Such evidence may include "lay opinion testimony that conflicts with the experts or demeanor evidence that, when considered in light of the other evidence, permits a reasonable inference of sanity to be drawn." Id. An expert witness who testifies that he or she has no opinion as to a defendant's sanity does not provide probative evidence on that question. Id. at 711. "[A]s a matter of law, a person is either sane or insane at the time of the crime; there is no intermediate ground." Id. Where one or more experts offer an opinion that a defendant was insane when a crime was committed, while another expert fails to offer any opinion, this is treated as if there is unconflicting expert testimony that the defendant was insane for purposes of appellate review. See id. at 711-12.

Lawson first argues that Dr. Wieland did not provide probative evidence on the question of Lawson's sanity, thus leaving only Dr. Trier's opinion of insanity. Although Dr. Wieland offered a blanket statement that Lawson was sane at the time of J.K.'s death, Lawson claims that his explanations for that finding and subsequent testimony render that opinion lacking in probative value, as if he had failed to offer any opinion on her sanity. We disagree with Lawson's assertion on this point.

As a court's witness, the trial court asked Dr. Wieland whether he had an opinion on whether Lawson was "sane or insane at the time of the offense," and he responded, "My opinion [sic] that Ms. Lawson was able to determine right from wrong regardless of

10

a delusional process she may have." Tr. pp. 443-44.[6] Dr. Wieland also testified that he believed there was "no evidence that she was unable to appreciate the wrongfulness of her conduct at the time of the offense." Id. at 473.

Despite this testimony, Lawson essentially argues that we should disregard it. She draws a comparison to Galloway, where an expert who originally testified that he believed the defendant was sane later opined after extensive cross-examination that he was unable to offer a definite opinion on sanity, and a majority of our supreme court concluded that such testimony equated to the expert's failure to offer an opinion on the defendant's sanity. See Galloway, 938 N.E.2d at 711.[7] Dr. Wieland did testify, in explaining his finding of sanity, that Lawson had a "belief at that particular time . . . that her actions would help her child not harm. So she has a belief that helping is better than harming." Tr. pp. 446-47. Arguably, this explanation of his findings is inconsistent with his testimony that Lawson was sane, which necessarily implies that she knew that what she was doing was wrong when she killed J.K. Likewise, the jury submitted a question to Dr. Wieland asking whether "an insane person [can] in any way tell the difference

---

[6] As indicated by Dr. Wieland's reference to "a delusional process she may have," he did not give a definitive opinion on whether Lawson was in fact suffering from a mental illness and delusions, nor was he directly asked that question. On the other hand, Dr. Wieland did not give any testimony that Lawson was malingering or faking her claims of delusions, which were corroborated by the testimony of K.K. and Hawkins's children regarding her belief that J.K. was possessed by a demon. As noted, the jury found Lawson guilty of these offenses, not guilty but mentally ill, meaning it concluded Lawson suffered from no mental illness at all when she committed them.

[7] Justices Shepard and Dickson strongly disagreed with the majority's assessment of the expert's testimony, believing it was within the province of the jury to believe the expert's written report and direct testimony finding the defendant to be sane and to find his answers on cross-examination to be "less compelling." Galloway, 938 N.E.2d at 718 (Shepard, C.J., dissenting).

11

between right and wrong." Id. at 478. Dr. Wieland responded, "Yes. Just because somebody is considered insane doesn't mean that they lose the ability [sic] ascertain right and wrong although many times they do." Id. Lawson contends it is incompatible with the legal definition of insanity to state that an insane person can tell right from wrong.[8]

Regardless of any perceived weaknesses in Dr. Wieland's testimony, we conclude it was within the province of the jury to assess the weight to be given to that testimony. We observe that the majority in Galloway did not reweigh the testimony of the expert or reassess his credibility. Rather, it relied upon the expert's ultimate conclusion, after being presented on cross-examination with facts of which he had previously been unaware, that he could not offer an opinion on the defendant's sanity. Galloway, 938 N.E.2d at 711. Here, by contrast, Dr. Wieland never wavered from his original opinion that Lawson was able to appreciate the wrongfulness of her conduct and, therefore, was legally sane at the time of these crimes. We decline to expand Galloway to cover the present situation.

Rather, we believe this case is covered by the well-established rule that an appellate court will not reassess the credibility of a witness unless such testimony was "incredibly dubious." "[A] court will impinge upon the jury's responsibility to judge the credibility of witnesses only when confronted with inherently improbable testimony or

---

[8] The State notes that Dr. Wieland was not specifically asked in this jury question about the legal definition of insanity, as opposed to insanity in a colloquial sense. In that regard, Dr. Wieland's comment about an "insane" person being able to tell right from wrong might only have meant that a person with even a severe mental illness may still possess the ability to appreciate the wrongfulness of his or her conduct, which is insufficient to meet the legal definition of insanity. See Galloway, 938 N.E.2d at 708.

12

coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity." Murray v. State, 761 N.E.2d 406, 408 (Ind. 2002) (emphasis added). Lawson does not make an "incredible dubiosity" argument. Moreover, as a general rule any discrepancies in expert witness testimony, or lack of facts and reasoning to support expert opinion, go to the weight to be given that testimony and not to its admissibility. See Krumm v. State, 793 N.E.2d 1170, 1180-81 (Ind. Ct. App. 2003), abrogated on other grounds by Hoglund v. State, 962 N.E.2d 1230 (Ind. 2012). That being the case, any inconsistencies or lack of clarity in Dr. Wieland's testimony was for the jury to consider in weighing his testimony. We decline to second-guess its apparent assessment of that testimony.

We conclude that Dr. Wieland's testimony is probative evidence that Lawson was sane when she committed these crimes, and that alone "is sufficiently probative of sanity," despite its conflict with Dr. Trier's testimony that Lawson was insane. See Galloway, 938 N.E.2d at 710. The jury certainly was free to credit Dr. Wieland's opinion over Dr. Trier's, especially given the much longer time Dr. Wieland spent examining and testing Lawson as opposed to Dr. Trier. See Fernbach v. State, 954 N.E.2d 1080, 1086 (Ind. Ct. App. 2011) (noting that jury was entitled "to give little or no weight" to insanity opinions of expert witnesses, based on their descriptions of how thoroughly they had examined the defendant), trans. denied.

Additionally, there was independent lay witness testimony tending to corroborate Dr. Wieland's opinion that Lawson was sane. First, Lawson told K.K. after J.K.'s death not to tell anyone about it because she could go to jail if anyone found out, which is

evidence of awareness of the wrongfulness of her conduct. Second, Lawson told persons who came investigating J.K.'s whereabouts either that he had been adopted or was visiting other family members, which is consistent with an attempt to "cover up" her wrongdoing. Third, several persons who interacted with Lawson while she was living with Hawkins noticed nothing unusual about her behavior; one of these persons went so far as to permit Lawson to babysit her children.

The Galloway majority carefully scrutinized the so-called "demeanor" lay evidence of the defendant's sanity in that case, finding there to be limits to the probative value of such evidence. Galloway, 938 N.E.2d at 713. It held such evidence to be "of more limited value when the defendant has a long history of mental illness with psychosis." Id. The Galloway majority quoted extensively from this court:

> The proposition that a jury may infer that a person's actions before and after a crime are "indicative of his actual mental health at the time of the" crime is logical when dealing with a defendant who is not prone to delusional or hallucinogenic episodes. However, when a defendant has a serious and well-documented mental disorder, such as schizophrenia, one that causes him to see, hear, and believe realities that do not exist, such logic collapses . . . .

Moler v. State, 782 N.E.2d 454, 458–59 (Ind. Ct. App. 2003), trans. denied. The Galloway majority also noted that "insanity is not limited to the stereotypical view of a 'raging lunatic'—a person experiencing a psychotic delusion may appear normal to passersby." Galloway, 938 N.E.2d at 713-14.

14

The Galloway majority observed that the concept of using lay witness demeanor evidence had more probative value to negate an insanity defense when it was based on whether the defendant had the capacity to conform his or her conduct to the law's requirements, but that basis for an insanity defense was removed from the statute in 1984. Id. at 714. Finally, the Galloway majority noted that "demeanor evidence before and after a crime is of more limited value than the defendant's demeanor during the crime." Id. Indiana recognizes claims of "temporary insanity," and so there is the possibility that a defendant may be legally insane when a crime is committed but apparently sane immediately before and after the crime. Id. In sum, "demeanor evidence must be considered as a whole, in relation to all the other evidence." Id.

We believe the observations of the Galloway majority have limited application in this case, where there is in fact expert testimony that Lawson was sane at the time of these crimes. That is, the "demeanor" evidence in this case is not being used as the sole basis for a finding of sanity, but merely as corroboration of Dr. Wieland's testimony. Moreover, unlike the defendant in Galloway, Lawson does not have a long-standing, well-documented history of severe mental illness. In fact, Dr. Trier's diagnosis is the only one on record suggesting she has a mental illness at all, and she has never received treatment for any such illness. We acknowledge that a mental illness must begin sometime, and the lack of a long-standing history of mental illness should not automatically preclude a finding of insanity. Still, the lack of such history is a circumstance that a fact-finder may consider in evaluating an insanity defense. Here,

15

considered in relation to all of the evidence in the case, including Dr. Wieland's testimony, the "demeanor" evidence in this case had probative value tending to support the jury's rejection of Lawson's insanity defense.

Lawson's behavior in this case admittedly was highly bizarre; her actions concerning the "exorcism" and retention of J.K.'s body thereafter were confirmed by three independent eyewitnesses. Still, as we recently noted, our supreme court has affirmed the rejection of an insanity defense even "where the crimes appear to have been completely irrational." Fernbach, 954 N.E.2d at 1087. One such case was Gambill v. State, 675 N.E.2d 668, 672-73 (Ind. 1996), where a defendant had drowned her five-year-old son for the stated purpose of preventing friends whom she believed were "devils" from sacrificing him and four expert witnesses testified that the defendant was insane at the time of the crime, but there was lay testimony opining that the defendant in fact knew the wrongfulness of her actions. Another case was Barany v. State, 658 N.E.2d 60 (Ind. 1995), where a defendant bit off his girlfriend's finger, shot her eight times, then hit her in the head and chest with a splitting maul, saying that "all women [were] evil" and that the finger had contained an "evil worm." Although three expert witnesses testified that the defendant was insane at the time of the crime, our supreme court affirmed the rejection of the insanity defense based on the defendant complaining to a police officer about the victim's "nagging," a friend's opinion that the defendant had seemed "O.K.," and the defendant having told his sister that he believed the victim was phoning the

16

police when he shot her.[9]  Barany, 658 N.E.2d at 64.  In a third case cited to us by the State, whose facts are quite similar to those here, our supreme court affirmed rejection of an insanity defense where a woman killed a child after giving him an overdose of salt, but claimed to have done so because she was Jesus and she had given the child salt in order to "cleanse" his body and four expert witnesses unanimously testified that the defendant was legally insane at the time of the crime.  Mayes v. State, 440 N.E.2d 678, 682 (Ind. 1982).  Compared to these cases, we cannot say Lawson's behavior was so much more bizarre that reversal of her convictions is warranted on the basis that the jury improperly rejected her insanity defense.

## Conclusion

It may be, as suggested by defense counsel at oral argument, that Galloway requires closer appellate scrutiny of insanity defense claims than had been the case before.  Still, even after applying such scrutiny in this case, we hold there is sufficient evidence to support the jury's rejection of Lawson's insanity defense.  We affirm.

Affirmed.

NAJAM, J., and MATHIAS, J., concur.

---

[9] In Moler, this court criticized Barany as making it "very difficult even for defendants with well-documented mental illnesses to successfully raise the insanity defense" and stated, "In the interests of justice, we hope that our supreme court will revisit this rule."  Moler, 782 N.E.2d at 458–59.  Although the Galloway majority quoted at length from Moler, it stopped short of expressly criticizing or disapproving of Barany, and it also did not disapprove of Gambill.