FILED

Mar 17 2017, 9:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Michael Miller,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

March 17, 2017

Court of Appeals Case No.
28A04-1603-CR-634

Appeal from the Greene Circuit
Court

The Honorable Erik C. Allen,
Judge

Trial Court Cause No.
28C01-1408-F1-2

**Barnes, Judge.**

## Case Summary

[1] Michael Miller appeals his conviction for attempted murder. We reverse and remand.

# Issues

The issues we address today are:

    I.      whether Miller was denied his right to a speedy trial under Indiana Criminal Rule 4(B);

    II.     whether the trial court properly rejected his insanity defense; and

    III.    whether the trial court applied an incorrect standard in convicting Miller of attempted murder.

# Facts

At about 11:30 p.m. on the night of August 10, 2014, Jeremy Kohn was sitting on the porch of his residence in Bloomfield with his girlfriend, Kylee Bateman. Kohn and Bateman observed Miller twice approach a neighboring house, knock on the door or ring the door bell, and then walk away. Kohn did not know Miller personally but believed he may have gone to school with him. Kohn and Bateman waved at Miller. Bateman was telling Kohn a story that may have made them both laugh; Miller apparently believed Kohn and Bateman were laughing at him. He then approached Kohn "nonchalantly," drew a pocketknife with a three-to-four-inch blade, and cut Kohn's throat without saying a word. Tr. p. 53. Miller, who had a "blank look" on his face, then turned around and left, still without saying anything. *Id.* The cut to Kohn's neck was not deep enough to damage his jugular vein, carotid artery, or

trachea, although a slightly deeper cut could have done so and would have posed a risk of death. The wound required over forty stiches to close.

[4] On August 13, 2014, Marshall Randy Raney of the Worthington Police Department responded to a report of a suspicious person in a local cemetery. Worthington is about twelve miles from Bloomfield. The suspicious person was Miller. Marshall Raney believed Miller seemed "backward" and quiet. *Id.* at 74. Miller told Marshall Raney that he was trying to hitchhike his way to Indianapolis. At the time of this encounter with Marshall Raney, Miller had not yet been identified as a suspect in the attack on Kohn.

[5] Later on August 13, Miller was arrested in Worthington, about twelve miles away from Bloomfield. As Miller was being placed in handcuffs by Deputy Harvey Holt of the Greene County Sheriff's Department, he said that he knew why he was being arrested and asked what charges he would face. Miller then submitted to an interview conducted by Officer Marvin Holt of the Bloomfield Police Department after waiving his Miranda rights.

[6] During the interview, Miller said he had been attempting to return a textbook and some flashcards to a former teacher; Miller was twenty-four years old at the time of the crime. He volunteered several times that he was not "paranoid" or "psychotic" or on drugs, but he also said that people he encountered often attempted to frighten him or laughed at him. Ex. 7. He then admitted that he cut Kohn's throat with a knife after Kohn and Bateman smiled at him, and Kohn looked at Bateman and shook his head. Officer Holt related that family

members had expressed concern about Miller's mental health and asked Miller whether he believed he needed help or medication; Miller denied that he did so and said he believed he was fine. Miller said that, because he did not hear any sirens after cutting Kohn's throat, he assumed neither Kohn nor Bateman called police or the police did not care, and he decided to go to Indianapolis, apparently by a combination of walking and hitchhiking. Miller also engaged Officer Holt in conversation about why it had taken several days for police to contact him and said he was aware that what he had done was against the law. Officer Holt asked Miller whether he wanted to kill Kohn, and Miller replied that he did not care. He said that he accepted responsibility for what he had done and that he assumed he would go to jail and asked Officer Holt if he could bring his Bible to jail. At one point, after Officer Holt asked Miller whether he might hurt someone again in the future, Miller explained, "Some people can view human life the same way but have different outcomes because of emotion. I don't have the emotion." *Id.* at 15:50. Miller had a calm demeanor during the interview, spoke throughout in an even and emotionless tone of voice, and ate a candy bar and drank a soda while he talked to Officer Holt.

[7] On August 14, 2014, the State charged Miller with one count of Level 1 felony attempted murder and one count of Level 3 felony aggravated battery. The charging information for attempted murder read in part that Miller "did knowingly or intentionally attempt to commit the crime of Murder, to-wit: to knowingly kill Jeremy Kohn, and Michael A. Miller did engage in conduct which constituted a substantial step toward the commission of the crime of

murder, to-wit:  cut Jeremy Kohn's throat with a knife . . . ."  App. p. 29.  The State later amended the information to reduce the battery charge to a Level 5 felony.

[8]   It is undisputed that Miller has a lengthy history of mental illness.  His mother reported that he was oxygen-deprived during birth and began exhibiting abnormal behavior at age two, such as hyperactivity and self-isolation from other children.  Miller was learning disabled, and in second grade, he began attending therapy and taking medication.  Miller regularly attended therapy between the ages of nine and seventeen, when he quit because it "wasn't really going well."  Tr. p. 117.  As a child, Miller was diagnosed with attention deficit hyperactivity disorder and depression, and apparently was suspected at one point of having autism.  Testing at age nine revealed Miller had brain abnormalities, although the precise nature of those abnormalities is unclear.

[9]   After graduating high school, Miller's behavior became more bizarre, and he was unable to hold down a job.  He would often whistle, though just one note and not a melody.  He would approach people and touch their faces.  He would constantly tap on things.  In the three years leading up to the crime, Miller was very withdrawn and isolated, and he had rarely if ever left his family's property during that time.

[10]  On August 15, 2014, Miller's attorney filed a notice of defense of mental disease or defect.  At the end of September 2014, a court-appointed psychologist, Mark Hickman, reported to the trial court his belief that Miller

was suffering from "Delusional Disorder, Paranoid Type . . . ." App. at 135. Hickman further believed that, because of this mental disorder, there was "reason to doubt both his sanity at the time of the alleged crime, as well as his current comprehension and competency to stand trial and to work with an attorney on his own defense." *Id.*

[11] A court-appointed psychiatrist, Dr. Gregory Sidell, also examined Miller and submitted a report to the trial court at the end of January 2015. Dr. Sidell stated that Miller had described a "bizarre delusional system" that included hearing the voice of his grandmother, whom Miller called "a witch." *Id.* at 137. Miller said his grandmother controlled demons, who in turn controlled Freemasons, and that Miller was somehow under the control of a Freemason when he cut Kohn's throat. *Id.* at 139. Miller also related his belief that persons often mocked him, which was part of a "prophecy" that had been revealed to Miller. *Id.* Dr. Sidell believed that, "although [Miller was] aware at the time of the wrongful nature of his actions, [he] nevertheless appears to have been operating under the influence of a complicated psychotic delusional system, consistent with schizophrenia." *Id.* at 140. Dr. Sidell also believed that Miller's "ability to assist his defense counsel is very limited, because he believes counsel to be a member of the Freemasons." *Id.*

[12] On March 16, 2015, the trial court, with the consent of both the prosecutor and defense counsel, entered an order finding Miller incompetent to stand trial and committed him to the Division of Mental Health and Addictions. Miller was transported to Logansport State Hospital ("the Hospital"), where he received

treatment, including medication, for schizophrenia. On July 21, 2015, the Hospital certified to the trial court that Miller was competent to stand trial,[1] and he was transported back to the Greene County Jail to await trial.

[13] On August 25, 2015, Miller filed a motion for speedy trial. The trial court scheduled a jury trial to begin on October 19, 2015, within the seventy-day speedy trial limit; the seventy-day deadline would have expired on November 3, 2015. Miller later requested a bench trial, and one was scheduled for the same date, October 19, 2015. On August 26, 2015, the trial court entered an order requiring the Hospital to produce to Miller's attorney, by September 9, 2015, all of Miller's medical and mental health records. There is no indication in the record that the Hospital failed to produce the records by that date, and/or that such records could not be or were not available to the State in a similar time frame.

[14] On September 10, 2015, the State filed a motion to compel Miller to submit to an examination by a psychiatrist it had retained, Dr. David Crane. The State represented that it had "provided to Dr. Crane the relevant documents and discs in its file to assist him in his evaluation of the Defendant but is requesting a Court Order authorizing the Defendant to be evaluated by Dr. David Crane as soon as possible . . . ." *Id.* at 70. The trial court granted the motion to compel on September 15, 2015.

---

[1] Miller denied experiencing hallucinations or delusions to the examining psychiatrist at the Hospital.

[15] On September 21, 2015, the State scheduled an evaluation of Miller by Dr. Crane to be conducted on October 8, 2015. On September 22, 2015, the State filed a motion to continue the trial to allow Dr. Crane additional time to review medical records and prepare a report about Miller. Specifically, Dr. Crane wrote a letter provided to the trial court stating:

> I have reviewed the material you [the prosecutor] sent regarding Michael Miller.
>
> Based on that review, it would be extremely helpful to have records from any previous medical care he received while in Logansport, as well as, the examinations that were done by the two appointed experts.
>
> Recognizing the potential delays in gathering this information, I would like to request a delay from the court in regard to his current litigation.

*Id.* at 75. Miller objected to the State's continuance request on the basis that it would violate his speedy trial request. Miller also noted that, in addition to the two court-appointed specialists who had examined him before he was determined to be incompetent and committed to the Hospital, he also had been examined by a third specialist retained by the defense and the results of that examination had been provided to the State. On September 24, 2015, the trial court overruled the objection and re-scheduled trial to begin on January 20, 2016.

[16] On October 15, 2015, the trial court appointed a third expert to examine Miller, psychiatrist Dr. Frederick Nolen. Dr. Nolen examined Miller at the end of October. Dr. Nolen then filed a report with the trial court concluding that Miller suffered from paranoid schizophrenia and was not sane at the time of the offense.

[17] Miller's bench trial began as scheduled on January 20, 2016. Miller did not make a motion for discharge based on the alleged violation of his speedy trial rights. The State did not present any evidence from Dr. Crane regarding his examination of Miller. Miller first presented the testimony of psychologist Jeffrey Huttinger. Huttinger examined Miller in October 2014. He opined that Miller suffered from a moderate to severe case of paranoid schizophrenia, suffering from delusions and auditory hallucinations that were influencing or, in some cases, controlling him. Ultimately, Huttinger believed that, at the time of the crime, Miller suffered from a mental disease or defect that affected his ability to appreciate the wrongfulness of his conduct. Huttinger stated that, although Miller acknowledged he had done something wrong, he lacked understanding of why it was wrong.

[18] Next, Dr. Sidell testified. He agreed that Miller suffered from schizophrenia. However, he differed slightly from Huttinger in that he believed Miller "probably did understand the wrongfulness of his actions, but I think that he was unable to resist the strong urge to nevertheless take those actions at the time that they occurred . . . ." Tr. p. 170. The final expert to testify was Dr. Nolen. As with Huttinger and Dr. Sidell, he believed Miller suffered from

paranoid schizophrenia. He further believed Miller suffered from delusions at the time of the attack and was unable to appreciate the wrongfulness of his conduct.

[19] At the conclusion of trial, the trial court took the case under advisement. On January 27, 2016, it entered detailed, written "Findings, Conclusions and Judgment of Conviction." App. p. 102. In those findings, the trial court explained why it was discounting the expert opinions regarding Miller's sanity or lack thereof and rejecting his defense of mental disease or defect. It noted that it was relying instead upon courtroom observations of Miller, as well as his comportment during the police interview and his actions and demeanor near the time of the crime.

[20] The findings also repeated the language of the charging information for attempted murder, namely that Miller "did knowingly or intentionally attempt to commit the crime of Murder, to-wit: to knowingly kill Jeremy Kohn . . . ." *Id.* The trial court found and concluded "that Defendant had the requisite intent to kill as he used a knife, which is a deadly weapon, to deliberately cut the victims [sic] throat in a manner that was likely to cause death or great bodily harm." *Id.* at 104. The trial court also expressly found beyond a reasonable doubt that Miller "did knowingly or intentionally attempt to commit the crime of Murder, to-wit: to knowingly kill Jeremy Kohn . . . ." *Id.* at 105.

[21] The trial court entered judgments of conviction of guilty but mentally ill for both Level 1 felony attempted murder and Level 5 felony battery. At

sentencing, the trial court merged the battery conviction with the attempted murder conviction. It sentenced Miller to a term of thirty years, with twenty years executed and ten years suspended to probation. Miller now appeals.

# Analysis

## I. Speedy (or "Early") Trial

[22] We first address Miller's claim that his rights under Indiana Criminal Rule 4(B) were violated when his trial was held more than seventy days after he requested a speedy trial. Criminal Rule 4(B) provides in part:

> If any defendant held in jail on an indictment or an affidavit shall move for an early trial, he shall be discharged if not brought to trial within seventy (70) calendar days from the date of such motion, except where a continuance within said period is had on his motion, or the delay is otherwise caused by his act, or where there was not sufficient time to try him during such seventy (70) calendar days because of the congestion of the court calendar.

Additionally, Criminal Rule 4(D) states:

> If when application is made for discharge of a defendant under this rule, the court be satisfied that there is evidence for the state, which cannot then be had, that reasonable effort has been made to procure the same and there is just ground to believe that such evidence can be had within ninety (90) days, the cause may be continued, and the prisoner remanded or admitted to bail; and if he be not brought to trial by the state within such additional ninety (90) days, he shall then be discharged.

[23] The overall goal of Criminal Rule 4 "is to provide functionality to a criminal defendant's fundamental and constitutionally protected right to a speedy trial."

*Austin v. State*, 997 N.E.2d 1027, 1037 (Ind. 2013). "It places an affirmative duty on the State to bring the defendant to trial, but at the same time is not intended to be a mechanism for providing defendants a technical means to escape prosecution." *Id.* Although Criminal Rule 4(B)'s intent is to effectuate speedy trial rights under the United States and Indiana Constitutions, review of claimed violations of Rule 4(B) "is separate and distinct from reviewing claimed violations of those constitutional provisions." *Id.* at 1037 n.7.

[24] Miller contends the trial court erred in continuing his trial so that the State's expert could have additional time to examine him and review his mental health records. Miller objected to granting the continuance and scheduling a trial date beyond the seventy-day limit. However, he did not subsequently move to be discharged.

[25] Some cases have held that, even if a defendant objects to a trial date outside the limits of Criminal Rule 4, he or she must also move for discharge prior to trial in order to preserve any claim of error. *See Parker v. State*, 965 N.E.2d 50, 52 (Ind. Ct. App. 2012) (quoting *Hampton v. State*, 754 N.E.2d 1037, 1039 (Ind. Ct. App. 2001), *trans. denied*), *trans. denied*; *see also Sundling v. State*, 679 N.E.2d 988, 991 (Ind. Ct. App. 1997). If a defendant does not make such a motion, the claim is waived on appeal. *Parker*, 965 N.E.2d at 52. These holdings trace back to *Lloyd v. State*, 448 N.E.2d 1062 (Ind. 1983). In that case, our supreme court stated that a motion for discharge "provides an enforcement mechanism for Criminal Rule 4(B) and defendant's failure to attempt to enforce his request for a speedy trial waives any issue thereon. Failure to make a timely motion for

discharge prior to trial constitutes a waiver of that right to discharge." *Id.* at 1066. The defendant in *Lloyd* also had not objected to the setting of a trial date outside the seventy-day deadline, and the court also found "acquiescence and waiver" for that reason. *Id.* The defendants in *Hampton* and *Sundling* also had in fact failed to object to trial dates outside the Criminal Rule 4 time limits in addition to failing to move for discharge.

[26] By contrast, in *Otte v. State*, 967 N.E.2d 540 (Ind. Ct. App. 2012), *trans. denied*, this court rejected the State's argument that the defendant had waived his Criminal Rule 4 complaint by failing to move for discharge in addition to objecting to a too-late trial date. The State had relied upon *Brown v. State*, 725 N.E.2d 823 (Ind. 2000), which discussed the requirements for preserving a Criminal Rule 4 error. After parsing *Brown*'s language, the *Otte* panel concluded it stood for the proposition that a defendant may preserve such an error by *either* objecting to a trial date *or* by moving for discharge and that both are not required. *Otte*, 967 N.E.2d at 544. The *Otte* panel observed that the defendant had not "sat idly by and waited for deadlines to pass, only that he used a single means, namely timely objections, to bring it to the court's attention. We are satisfied that this was enough to preserve the claim and decline the State's invitation to resolve this appeal on waiver grounds." *Id.*; *see also King v. State*, 61 N.E.3d 1275, 1280 n.3 (Ind. Ct. App. 2016) (holding defendant preserved claim of Criminal Rule 4(B) error by objecting to trial date and did not need to also move for discharge), *trans. denied*.

[27]     Given the current conflicting state of affairs on this question, we will err on the side of addressing Miller's claim of error on the merits. Miller did not completely stand idly by and wait for the seventy-day deadline to pass before complaining. Rather, he objected to continuance of the trial precisely because it would put the trial date past that deadline and violate his speedy trial rights.

[28]     Criminal Rule 4(D)[2] permits trial courts to grant a continuance beyond a seventy-day early trial deadline if "(1) there is evidence for the State that cannot then be had, (2) reasonable effort has been made by the State to procure the evidence, and (3) there is just ground to believe that such evidence can be had within ninety days." *Smith v. State*, 982 N.E.2d 393, 401 (Ind. Ct. App. 2013), *trans. denied*. Exigent circumstances may allow a reasonable delay beyond the limitations of Criminal Rule 4. *Id.* We review a trial court's decision to grant a continuance under Criminal Rule 4(D) for an abuse of discretion, and the reasonableness of any delay must be judged in the context of the particular case. *Id.* "'Rule 4(D) does not mandate the evidence be essential or unique, only that it be unavailable and that the State be entitled to present it.'" *Wilhelmus v. State*, 824 N.E.2d 405, 413 (Ind. Ct. App. 2005) (quoting *Smith v. State*, 502 N.E.2d 485, 488 (Ind. 1987)).

---

[2] The State also essentially argues that, because Miller filed notice of intent to pursue an insanity defense, any delays related to investigating that defense were attributable to Miller, including delays related to the State's hiring of its own expert. We reject any claim that, merely by pursuing an insanity defense, a defendant waives his or her speedy trial rights or that all delays associated with investigating that defense automatically are attributable to the defendant.

[29]     When a defendant files notice of intent to pursue an insanity defense, the State is entitled to hire its own expert to examine the defendant. *See Taylor v. State*, 659 N.E.2d 535, 541 (Ind. 1995); *Esmond v. State*, 20 N.E.3d 213, 216 (Ind. Ct. App. 2014). Such examinations and the reports following them may take some time to conduct and prepare, depending on the complexity of the issues involved. The State's hired expert, Dr. Crane, represented that he needed additional time to acquire and review Miller's medical records in order to fully assess his mental health. That representation is not facially unreasonable. Although there was an order issued at the end of August 2015 for the Hospital records to be released to defense counsel, there is no clear indication one way or the other whether the records were in fact timely released and whether they were or could have been made available to Dr. Crane in time for him to review them thoroughly and prepare a report prior to the October 19, 2015 trial date after examining him in person just eleven days before.

[30]     Miller questions why the State did not previously hire an expert to examine him, noting that he filed notice of his intent to pursue an insanity defense the day after he was charged. Additionally, although the time that Miller spent in the Hospital after being found incompetent to stand trial may have excused any trial preparation by the State during those several months, Miller was not found incompetent until approximately seven months after charges were filed and he had filed notice of pursuing an insanity defense. During that time, Miller was examined by two court-appointed experts and one expert hired by the defense.

We concede that the State could have hired its own expert as well during that time frame.

However, we also note that Miller did not move for a seventy-day early trial until after he was released from the Hospital, at the end of August 2015. In other words, the State was not on notice that Miller would be seeking an early trial until August 25, 2015. After Miller filed his early trial request, the State proceeded expeditiously to find and hire an expert and to schedule an examination of Miller.

Further, we place little emphasis on the fact that the State ended up not calling Dr. Crane at trial or utilizing any of his reports or opinions. It may indeed be the case that Dr. Crane's opinion regarding Miller's sanity largely paralleled those of the other experts who examined him. However, we reiterate, "'Rule 4(D) does not mandate the evidence be essential or unique, only that it be unavailable and that the State be entitled to present it.'" *Wilhelmus*, 824 N.E.2d at 413. At the time the State requested an evaluation of Miller by Dr. Crane, it was unknown what Dr. Crane ultimately would conclude. Regardless, the State was entitled to pursue that evaluation in preparing to rebut Miller's insanity defense. We evaluate the reasonableness of the State's request for a trial delay in light of the information known or available to it at the time of the request. There is no evidence here that the State was mistaken or misrepresented the facts when it requested more time for its expert to complete an evaluation of Miller. *Cf. Chambers v. State*, 848 N.E.2d 298, 304 (Ind. Ct. App. 2005) (holding State failed to establish that missing lab test results could

not be procured before trial date where, in fact, State crime lab had already completed test results but they were not yet in prosecutor's physical possession), *trans. denied*.

[33] We reiterate that our standard of review with respect to granting of the State's continuance request under Criminal Rule 4(D) is for an abuse of discretion.[3] In general, an abuse of discretion occurs if a decision is clearly against the logic and effect of the facts and circumstances before the trial court or if it misinterprets or misapplies the law. *Gil v. State*, 988 N.E.2d 1231, 1234 (Ind. Ct. App. 2013). We also emphasize that constitutional considerations are not directly implicated here. *See Austin*, 997 N.E.2d at 1037 n.7. Given that whether to grant the State's continuance was a matter within the trial court's sound discretion, and given the complexity that a defense of insanity can present in a case, we cannot say the trial court abused its discretion in granting the State's continuance request and by extending the start of Miller's trial for ninety days. *Cf. Wilhelmus*, 824 N.E.2d at 413 (affirming granting of fourteen-day continuance to State under Criminal Rule 4(D) where very large methamphetamine lab was involved, two key witnesses were unavailable on the trial date, critical lab test results were procured by the State only four days

---

[3] Our supreme court has clarified that, when reviewing a trial court's finding of court congestion as a reason for delaying an early trial request under Criminal Rule 4(B), the correct standard of review is for clear error, not an abuse of discretion. *Austin*, 997 N.E.2d at 1040. Although the court expressly said its holding should also apply to issues arising under Criminal Rules 4(A) and 4(C), it was silent with respect to review of State continuance requests under Criminal Rule 4(D). *See id.* at 1038 n.8. Thus, we will continue to apply the abuse of discretion standard in this case.

before trial, computer encryption analysis was still underway, and State had received information of improper conduct between the local sheriff and the defendant and two co-defendants). Miller's trial began within the limits prescribed by Criminal Rules 4(B) and 4(D).

## II. Rejection of Insanity Defense

[34] Next, we address Miller's claim that the trial court improperly rejected his insanity defense. Even if the State proves every element of a crime beyond a reasonable doubt, a defendant can avoid criminal responsibility for that crime by raising and proving an insanity defense. *Lawson v. State*, 966 N.E.2d 1273, 1278 (Ind. Ct. App. 2012), *trans. denied*. Indiana Code Section 35-41-3-6 provides:

> (a) A person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense.

> (b) As used in this section, "mental disease or defect" means a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include an abnormality manifested only by repeated unlawful or antisocial conduct.

A defendant bears the burden of proving an insanity defense by a preponderance of the evidence. Ind. Code § 35-41-4-1(b).

[35] Miller is appealing from a negative judgment with respect to the trial court's rejection of his insanity defense. *See Lawson*, 966 N.E.2d at 1279. "When

reviewing a negative judgment, this court will not reweigh evidence, reassess witness credibility, or disturb reasonable inferences made by the trier of fact, even if more reasonable inferences arguably could have been made." *Id.* A defendant appealing rejection of his or her insanity defense must establish that the evidence is without conflict and leads only to the conclusion that he or she was legally insane when the crime was committed. *Id.* "Although this standard of review is deferential, it is not impossible. . . . An impossible standard of review under which appellate courts merely 'rubber stamp' the fact finder's determinations, no matter how unreasonable, would raise serious constitutional concerns because it would make the right to an appeal illusory." *Galloway v. State*, 938 N.E.2d 699, 709 (Ind. 2010).

[36] If a number of mental health experts have examined a defendant and offered conflicting opinions on whether a defendant met the legal definition of insanity at the time of an offense, such conflict by itself is probative evidence of sanity. *Lawson*, 966 N.E.2d at 1279. Even if experts unanimously agree that a defendant was insane when a crime was committed, a fact finder "may still reject an insanity defense if there is 'other evidence of probative value from which a conflicting inference of sanity can be drawn.'" *Id.* (quoting *Galloway*, 938 N.E.2d at 712). "Such evidence may include 'lay opinion testimony that conflicts with the experts or demeanor evidence that, when considered in light of the other evidence, permits a reasonable inference of sanity to be drawn.'" *Id.* (quoting *Galloway*, 938 N.E.2d at 712). An expert's failure to give an opinion on a defendant's sanity is tantamount to a lack of probative evidence as

to sanity and does not create a conflict with other testimony that the defendant was insane. *Id.*

[37] We first note that there is *not* uncontradicted testimony in this case that Miller was insane at the time of the offense, at least not insane as clearly defined by Indiana law. Specifically, psychologist Huttinger and psychiatrist Dr. Nolen indicated in their testimony that they believed Miller suffered from schizophrenia and was under the influence of delusions at the time of the offense such that he did not appreciate the wrongfulness of his conduct. This testimony met the legal definition of insanity. Psychiatrist Dr. Sidell, however, testified, "I think that probably Mr. Miller did appreciate the wrongfulness of his actions, but I think that Mr. Miller was unable to resist the urge or the impulse to do those actions anyhow because Mr. Miller was simply too psychotic and to [sic] symptomatic with his schizophrenia." Tr. p. 171. Dr. Sidell essentially testified that Miller had an "irresistible impulse" to commit the crime even though he knew it was wrong, but that basis for a claim of insanity was removed by statute in 1984. *See Benefiel v. State*, 578 N.E.2d 338, 350 (Ind. 1991), *cert. denied*. As such, Dr. Sidell's testimony is that Miller did not meet the legal definition of insanity at the time he cut Kohn's throat. This alone is sufficient probative evidence to reject Miller's insanity defense.

[38] The trial court also relied upon "demeanor" evidence in rejecting Miller's insanity defense, specifically eyewitness testimony at the time of the attack and Miller's police interview a few days later. We are cognizant that there are limits

to the value of such evidence. As this court and our supreme court have explained:

> "The proposition that a jury may infer that a person's actions before and after a crime are 'indicative of his actual mental health at the time of the' crime is logical when dealing with a defendant who is not prone to delusional or hallucinogenic episodes. However, when a defendant has a serious and well-documented mental disorder, such as schizophrenia, one that causes him to see, hear, and believe realities that do not exist, such logic collapses . . . ."

*Galloway*, 938 N.E.2d at 713 (quoting *Moler v. State*, 782 N.E.2d 454, 458-59 (Ind. Ct. App. 2003), *trans. denied*). "[I]nsanity is not limited to the stereotypical view of a 'raging lunatic'—a person experiencing a psychotic delusion may appear normal to passersby." *Id.* at 713-14.

[39] The undisputed evidence in the record is that Miller does indeed suffer from schizophrenia and accompanying delusional thoughts. However, and while it is also true that Miller has long suffered from mental health difficulties of one kind or another, the mental health evaluations following the knife attack were the first time he was found to have schizophrenia. The fact that a defendant does not have a long-standing history of suffering from a particular mental illness does not automatically preclude a finding of insanity, but it is a circumstance that a fact-finder may consider in evaluating an insanity defense. *Lawson*, 966 N.E.2d at 1282. Additionally, the demeanor evidence here corroborated Dr. Sidell's testimony that Miller understood the wrongfulness of his actions and, therefore, was not legally insane as defined by Indiana Code

Section 35-41-3-6. Thus, we need not determine whether the demeanor evidence in this case could have by itself supported the rejection of Miller's insanity defense. *See id.* In sum, despite substantial evidence of Miller's serious mental health problems, there is sufficient evidence to support the trial court's rejection of his insanity defense. *See id.* (affirming rejection of insanity defense based on conflicting expert testimony and demeanor evidence, where defendant killed her two-year-old child during an "exorcism" ceremony performed because defendant purportedly believed he was possessed by a demon).

### III.  Attempted Murder Standard

[40] Miller also argues more generally that there is insufficient evidence to sustain his conviction for attempted murder with respect to his mens rea. In a prosecution for attempted murder, the State must prove the defendant acted with the specific intent to kill the victim. *Kiefer v. State*, 761 N.E.2d 802, 805 (Ind. 2002). It is not enough to show that the defendant knowingly engaged in conduct that constituted a substantial step toward the commission of murder. *See Spradlin v. State*, 569 N.E.2d 948, 949-50 (Ind. 1991). "Intent to kill may be inferred from the nature of the attack and the circumstances surrounding the crime." *Kiefer*, 761 N.E.2d at 805. A trier of fact also may infer intent to kill from the use of a deadly weapon in a manner likely to cause death or great bodily harm. *Id.*

[41] We will not, in this opinion, address whether there is sufficient evidence of Miller's specific intent to kill to sustain his conviction for attempted murder. There is a specific sub-issue regarding that conviction raised by Miller that we

conclude compels reversal and remand; it would be premature at this time to address whether there was sufficient evidence of specific intent to kill. First, the charging information in this case alleged in part that Miller "did knowingly or intentionally attempt to commit the crime of Murder, to-wit: to knowingly kill Jeremy Kohn . . . ." App. p. 29. Second, the trial court here entered detailed findings explaining its thought process in finding Miller guilty. Those findings repeated the language of the charging information and concluded "that Defendant had the requisite intent to kill as he used a knife, which is a deadly weapon, to deliberately cut the victims [sic] throat in a manner that was likely to cause death or great bodily harm." *Id.* at 104. The trial court also expressly found beyond a reasonable doubt that Miller "did knowingly or intentionally attempt to commit the crime of Murder, to-wit: to knowingly kill Jeremy Kohn . . . ." *Id.* at 105. Miller contends that these references to a "knowing" mens rea indicate the trial court applied the wrong standard of proof in convicting him. The State did not address Miller's contentions regarding the charging information language or trial court's findings in its brief.

[42] In 1979, our supreme court first addressed the necessary mens rea to support an attempted murder conviction under our current criminal code. It held:

> Although there are somewhat varying definitions of what conduct actually constitutes an attempt, there is fundamental agreement on the two necessary elements of the crime. First, the defendant must have been acting with a specific intent to commit the crime, and second, he must have engaged in an overt act which constitutes a substantial step toward the commission of the crime.

*Zickefoose v. State*, 270 Ind. 618, 622, 388 N.E.2d 507, 510 (1979).

In *Spradlin v. State*, 569 N.E.2d 948 (Ind. 1991), our supreme court thoroughly analyzed the manner in which a jury must be instructed on an attempted murder charge.  It relied in part upon an earlier case, which held:

> "Thus we are left with instructions which would lead the jury to believe that the Defendant could be convicted of attempted murder if he knowingly engaged in conduct which constituted a substantial step toward the commission of murder.  Although one may be guilty of murder, under our statute, without entertaining a specific intent to kill the victim, he cannot be guilty of attempted murder without entertaining such intent."

*Spradlin*, 569 N.E.2d at 950 (quoting *Smith v. State*, 459 N.E.2d 355, 358 (Ind. 1984)).  The *Spradlin* opinion stated:

> Henceforth, we hold that an instruction which purports to set forth the elements which must be proven in order to convict of the crime of attempted murder must inform the jury that the State must prove beyond a reasonable doubt that the defendant, with intent to kill the victim, engaged in conduct which was a substantial step toward such killing.

*Id.*  The court reversed the attempted murder conviction before it because the jury had erroneously been instructed that it could find the defendant guilty if he had "knowingly or intentionally" engaged in conduct that was a substantial step toward the commission of murder.  *Id.* at 950-51.  "Instructing the jury with a list of elements which suggests that it may convict on a lesser mens rea, such as

'knowingly,' constitutes error." *Beasley v. State*, 643 N.E.2d 346, 348 (Ind. 1994).

[44] In the decades following *Spradlin*, numerous attempted murder convictions have been reversed because the jury was erroneously instructed that a "knowing" mens rea could be sufficient to support such a conviction. *See, e.g.*, *Rosales v. State*, 23 N.E.3d 8, 15 (Ind. 2015); *Guyton v. State*, 771 N.E.2d 1141, 1144 (Ind. 2002); *Metcalfe v. State*, 715 N.E.2d 1236, 1237 (Ind. 1999); *Beasley*, 643 N.E.2d at 348; *Jones v. State*, 868 N.E.2d 1205, 1213-14 (Ind. Ct. App. 2007), *trans. denied*; *Edwards v. State*, 773 N.E.2d 360, 363 (Ind. Ct. App. 2002), *trans. denied*; *Majors v. State*, 735 N.E.2d 334, 339 (Ind. Ct. App. 2000). Moreover, many of these reversals—including the ones in *Rosales*, *Metcalfe*, *Beasley*, *Jones*, and *Majors*—occurred even when there was no objection to the erroneous instructions; i.e., "*Spradlin* error" frequently has amounted to fundamental error. "*Spradlin* error" may not be fundamental, however, in cases where the defendant's intent was not a central issue at trial, or if the wording of the charging information sufficiently suggested the requirement of intent to kill. *Metcalfe*, 715 N.E.2d at 1237.

[45] We further note that, in *Patton v. State*, 810 N.E.2d 690 (Ind. 2004), our supreme court reversed a defendant's guilty plea to attempted murder where the charging information erroneously failed to allege that he had acted with specific intent to kill. The court held that the information failed to give the defendant adequate notice of the charges against him, rendering his plea invalid where the defendant had not unambiguously admitted to acting with specific intent to kill

and there was a lack of other evidence in the record establishing specific intent to kill beyond a reasonable doubt. *Patton*, 810 N.E.2d at 698-99.

[46] In short, as has been made clear repeatedly over the past several decades, a "knowing" mens rea is insufficient to sustain a conviction for attempted murder. "'[T]he stringent penalties for attempted murder and the ambiguity often involved in its proof' make it appropriate to 'single[ ] out attempted murder for special treatment.'" *Rosales*, 23 N.E.3d at 8 (quoting *Hopkins v. State*, 759 N.E.2d 633, 637 (Ind. 2001)). We are unaware of any case that has directly applied the principles of *Zickefoose* and *Spradlin* in the context of a bench trial, but we see no reason why they should not be applied here. Also, we acknowledge an analysis dependent upon jury instruction case law is not always appropriate when the defendant was convicted after a bench trial. *See Denning v. State*, 991 N.E.2d 160, 164 (Ind. Ct. App. 2013). However, we believe it is appropriate to do so here, given the "special treatment" accorded to attempted murder cases.

[47] We further are cognizant that a trial court is never required to make any findings or conclusions following a criminal bench trial or otherwise explain the thought process it engaged in before finding a defendant guilty, and any such statements need not be considered by a court on appeal. *See Dozier v. State*, 709 N.E.2d 27, 30 (Ind. Ct. App. 1999). However, given the severity of the charge against Miller and the incorrect language of the charging information, we find it impossible to ignore the trial court's findings that clearly misstate the proper standard for convicting a defendant of attempted murder. In a jury trial, there

is no way to divine a jury's thought process except by reference to the jury instructions; here, without jury instructions, we can divine that process by the trial court's findings.

[48] Both the charging information and the trial court's findings refer to the long-discredited notion that a "knowing" mens rea was sufficient to convict Miller of attempted murder. It was not. Moreover, Miller's intent was a central issue in this case. Despite our affirmance of the rejection of Miller's insanity defense, we offer no opinion at this time as to whether there is sufficient evidence that Miller acted with the specific intent to kill Kohn. It suffices to say that, even if the evidence could have supported that finding, we believe it also could support the conclusion he did not act with such intent.

[49] The difference between acting intentionally and knowingly is that a person acts "intentionally" when "it is his conscious objective to do so," while a person acts "knowingly" when "he is aware of a high probability that he is doing so." I.C. § 35-41-2-2. Miller did indeed cut Kohn's throat, which is always a dangerous act, but the cut was not extremely deep, did not damage any internal structures, and was performed with a three-to-four-inch smooth-bladed pocket knife. The only statement Miller made regarding the act and his mens rea was that he did not care whether Kohn lived or died, which would be indicative of only a knowing or possibly even reckless act, not one done with the intent to kill Kohn. The motive to attack Kohn, such as it was, was to seek some kind of revenge for Kohn and Bateman's perceived mocking of him—Miller was not previously acquainted with Kohn and did not have any grudge against him.

Miller was completely silent while he performed the act and made no attempt to harm Kohn further after not-deeply cutting his neck.

[50] We are left with grave questions here of whether the trial court as fact finder would have found Miller guilty of attempted murder if the charging information had been correct and if it had applied the correct standard of specific intent to kill. We are aware that this was a bench trial. Still, the principles of cases such as *Zickefoose* and *Spradlin* are so deeply-rooted and fundamental in Indiana law that we cannot allow Miller's attempted murder conviction to stand in clear contravention of those principles.

[51] The question we are confronting is whether the trial court in a bench trial, where the judge is presumed to know the law and correctly apply it, used the faulty "knowing" element to arrive at the guilty but mentally ill decision. We have concluded this presumption has been rebutted and that it appears the trial court applied the incorrect standard in deciding Miller's guilt. This is a circumstance that may be one of first impression. We are concerned as to what the appropriate legal remedy for Miller is, particularly considering his undisputed mental health issues.

[52] If this had been a jury trial, the answer would have been, naturally, to set aside the verdict and order a new trial. This being a bench trial presents a different and unique circumstance. To reverse and remand for a new trial is one alternative. To reverse and remand with instructions for the trial court to apply the correct legal standard to the evidence presented in the first trial is another

path, and one that might be employed were this a civil case. *See Johnson v. Wysocki*, 990 N.E.2d 456, 466–67 (Ind. 2013). The danger is that once we reverse and remand, the trial court judge who originally heard the case may have a difficult, if not impossible, task of distancing himself from the evidence already considered and in considering the case entirely anew, as we believe must be done in a criminal case. Thus, we reverse Miller's conviction and remand for a new trial, upon the filing of an amended and correctly-worded information, and after consideration and application of the proper standard of whether Miller acted with the specific intent to kill Kohn. *See Spradlin*, 569 N.E.2d at 951; *Jones*, 868 N.E.2d at 1214. The nearly forty-year guidelines of *Zickefoose* and its progeny must be followed. In order to allow Miller a clean slate, this remedy is, in our view, the most equitable.

## Conclusion

Miller's speedy trial rights were not violated by the trial court's granting of the State's continuance motion. There was sufficient evidence as a matter of law to reject Miller's insanity defense. However, it is apparent the trial court as fact finder applied the incorrect standard of a "knowing" mens rea rather than "specific intent to kill" in deciding to convict Miller of attempted murder. We reverse and remand for a new trial in accordance with this opinion.

Reversed and remanded.

Kirsch, J., and Robb, J., concur.